Filed 1/28/16 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JMR CONSTRUCTION CORP.,<br><br>  Plaintiff, Cross-Defendant, and Respondent,<br><br>v.<br><br>ENVIRONMENTAL ASSESSMENT and REMEDIATION MANAGEMENT, INC.,<br><br>  Defendant, Cross-Complainant and Appellant,<br><br>SURETEC INSURANCE COMPANY,<br><br>  Defendant and Appellant. | H039055<br>(Monterey County<br>Super. Ct. No. M105497)<br><br><br>**ORDER MODIFYING OPINION**<br><br>**NO CHANGE IN JUDGMENT** |

THE COURT:

The court orders that the partially published opinion filed December 30, 2015, be modified as follows:

On page 3, first full paragraph, strike the second sentence ("We also hold . . ."), and replace it with the following:

We also hold the court did not err in finding SureTec liable under the performance bonds, concluding that neither JMR's formal declaration of EAR's default nor its formal notice to SureTec of EAR's default was a condition precedent to JMR's recovery under the bonds.

On page 41, delete the first full paragraph ("SureTec contends . . ."), and replace it with the following:

SureTec contends the trial court erred in finding it liable under the performance bonds. It contends JMR was required, as a condition precedent under the bonds, to give (1) a declaration of EAR's default and (2) notice to SureTec of EAR's default. It argues that JMR's obligation to provide notice to SureTec of EAR's default "was a necessarily implied condition precedent" under the bonds.

The trial court held that JMR was entitled to recover from SureTec under the performance bonds, "whether or not JMR gave notice to [SureTec] of the default [by EAR]." In so concluding, the court relied in part on the language of Civil Code sections 2807 and 2808 (discussed, *post*).

On page 42, delete the second full paragraph ("Resolution of SureTec's . . ."), and replace it with the following:

We first address the standard of review applicable to SureTec's contention that JMR was required, as a condition precedent to seeking recovery under the performance bonds, to declare EAR's default and give SureTec notice of that default. Because no extrinsic evidence was introduced by the parties on the question, we independently review the trial court's interpretation of the bonds. (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336; see also *Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1461 [appellate court reviews interpretation of bonds de novo].)

On page 45, first full paragraph, after the first sentence "SureTec implicitly . . . liability."), insert the following:

Nor does SureTec assert that either performance bond expressly states that its liability is conditioned upon JMR's having given a prior declaration of default.

2

On page 45, first full paragraph, after what was formerly the fourth sentence ("Quoting from . . . [the contract . . .' " "), insert the following:

And SureTec contends that "the bond language, read as a whole, makes clear that a declaration of default was a condition precedent to SureTec's liability."

On page 45, first full paragraph, strike what was formerly the fifth sentence ("Applying principles . . ."), and replace it with the following:

Applying principles of contract interpretation, we conclude that JMR was not required to declare EAR's default or give notice to SureTec of EAR's default as a condition precedent to SureTec's liability on the bonds.

On page 46, first partial paragraph, delete the last sentence ("Thus, the bonds . . ."), and replace it with the following:

Thus, the bonds do not contain the requisite "clear, unambiguous language" (*Alpha Beta Food*, *supra*, 45 Cal.2d at p. 771) that would support a finding that JMR was required to declare EAR's default or provide a notice of default to SureTec as a condition precedent to its liability under the bonds.

On page 46, second full paragraph, delete the first sentence ("Here, as in . . ."), and replace it with the following:

Here, as in *Pacific Allied*, there was no language expressly conditioning SureTec's performance under the bonds upon JMR's declaration of EAR's default or SureTec's receipt of a notice of EAR's default from JMR.

On page 47, first partial paragraph, delete the last sentence ("Here, there was . . ."), and replace it with the following:

3

Here, there was no such express covenant requiring JMR to declare a default or provide notice to SureTec of any such default.

On page 47, first full paragraph, delete the first sentence ("We conclude . . ."), and replace it with the following:

We conclude that neither JMR's declaration of EAR's default nor its notice to SureTec of EAR's default is a condition precedent to triggering SureTec's liability under the bonds.

On page 47, first full paragraph, after the fourth sentence, delete the remainder of the paragraph (commencing with "(*Edwards v. Arthur Andersen LLP* . . ."), and replace it with the following:

(*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954, quoting § 1858.) Moreover, we observe that had SureTec desired to convey that its liability under the performance bonds was expressly conditioned by JMR's having previously declared a default and having given SureTec notice of default, it could have readily included such language in the bonds. (See *Safeco Ins. Co. of America v. Robert S.* (2001) 26 Cal.4th 758, 763 [applying § 1858 to reject insurer's contention that illegal act exclusion in homeowner's insurance policy should be construed as a "criminal act" exclusion, observing that if insurer had "wanted to exclude criminal acts from coverage, it could have easily done so"]; cf. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.* (Ala. 2002) 827 So.2d 747, 749 [addressing performance bond containing express condition that surety's obligation " 'shall arise after' " specified events, including the owner's obligation to give written notice to contractor and surety that it was considering declaring a default, and thereafter declaring the contractor's default].)

4

On page 48, at the end of the second paragraph, insert the following (including new footnote 12 and appropriate renumbering of subsequent footnotes):

Likewise, under Civil Code section 2808, a surety assuming liability "upon a conditional obligation . . . is [generally] not entitled to notice of default of the principal."[1]

On page 49, first full paragraph, delete first sentence, and replace it with the following:

SureTec relies on several out-of-state cases to support its contention that JMR was required to declare EAR's default and give SureTec notice of the default to recover under the bonds.

On page 50, second full paragraph, delete the first sentence, and replace it with the following:

We conclude the performance bonds did not require JMR to declare a default or give notice of a default to SureTec as a condition precedent to recovery under the bonds.

On page 50, former footnote 12 (now 13), delete the first sentence, and replace it with the following:

SureTec also cites *Wal-Noon*, *supra*, 45 Cal.App.3d 605 in support of its position that a declaration of default and notice to SureTec of the default was an implied condition precedent to recovery under the performance bonds.

---

[1] California Civil Code section 2808 provides: "Where one assumes liability as surety upon a conditional obligation, . . . [the surety] is not entitled to notice of default of the principal unless [it] is unable, by the exercise of reasonable diligence, to acquire information of such default and the creditor has actual notice thereof."

On page 51, in the continuation of former footnote 12 (now 13), delete the last sentence ("Those principles . . ."), and replace it with the following:

Those principles, along with the absence of a clear indication that the parties intended otherwise, compel our conclusion that neither a declaration of default nor a notice of default to SureTec was an implied condition precedent to recovery under the bonds.

The petition for rehearing filed on behalf of appellant SureTec Insurance Company is denied.

There is no change in the judgment.

Date: _____
                                                        Márquez, J.

_____          _____
Rushing, P.J.                                           Elia, J.

6

| | |
|---|---|
| Trial Court: | Monterey County Superior Court Superior Court No.: M105497 |
| | |
| Trial Judge: | The Honorable Lydia M. Villarreal |
| | |
| Attorneys for Plaintiff, Cross-Defendant, and Respondent JMR Construction Corp.: | Joseph P. Mascovich Miller Law Group |
| | |
| Attorneys for Defendant, Cross-Complainant and Appellant Environmental Assessment And Remediation Management, Inc.: | J. Brian Urtnowski Lisamarie McDermott Urtnowski & Associates, P.C. |
| | |
| Attorneys for Defendant, and Appellant SureTec Insurance Company: | Peter Abrahams Mitchell C. Tilner Horvitz & Levy |

Filed 12/30/15 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JMR CONSTRUCTION CORP., <br><br>     Plaintiff, Cross-Defendant, and Respondent, <br><br>              v. <br><br> ENVIRONMENTAL ASSESSMENT and REMEDIATION MANAGEMENT, INC., <br><br>     Defendant, Cross-Complainant and Appellant, <br><br> SURETEC INSURANCE COMPANY, <br><br>     Defendant and Appellant. | H039055 <br> (Monterey County <br> Super. Ct. No. M105497) |

This dispute arose from a public works project involving the construction of a dental clinic at the Presidio of Monterey (the Project). The owner, the United States Army Corps of Engineers (the Corps), retained JMR Construction Corp. (JMR) as general contractor for the Project. JMR, in turn, entered into various subcontracts, including separate electrical and plumbing subcontracts, with Environmental Assessment and Remediation Management, Inc. (EAR). SureTec Insurance Company (SureTec) issued separate bonds guaranteeing EAR's performance under the two subcontracts.

While the Project was ongoing, JMR (1) communicated with EAR about alleged delays, deficient and late submittals, and improper plumbing work, and (2) retained

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.A., I.C., III, IV, V, and VI of the Discussion.

certain funds otherwise due to EAR under the subcontracts. After the Project was completed, JMR filed suit against EAR and SureTec (collectively, defendants) for breach of contract and for foreclosure of the performance bonds. JMR alleged it was damaged as a result of EAR's failure to perform under the two subcontracts. EAR filed a cross-complaint for recovery of retention funds withheld under the subcontracts.

After a court trial, JMR was awarded the net amount of $315,631, which included an offset for the retention funds JMR withheld under the subcontracts. In posttrial proceedings, the court issued an order determining JMR was entitled to recover attorney fees in an amount to be determined for its successful defense of the cross-complaint. The court also awarded JMR $90,644.07 in expert witness fees pursuant to Code of Civil Procedure section 998[1] by concluding that JMR's total monetary recovery ($315,631 plus an undetermined amount of attorney fees) had exceeded the $375,000 amount of its pretrial settlement offers. SureTec and EAR filed separate appeals.

EAR makes seven arguments on appeal. First, it asserts there was no substantial evidence to support the trial court's finding it was liable to JMR for delays on the Project. Second, it argues the court erred by using the *Eichleay* method of calculating extended home office overhead damages. Third, it asserts the court erred by utilizing the modified total cost method of calculating disruption and delay damages. Fourth, it argues the court, in its statement of decision, failed to address essential matters of fact and law. Fifth, it contends the court erred in determining JMR was entitled to attorney fees in defending the cross-complaint. Sixth, it asserts JMR was not entitled to recover its expert witness fees pursuant to section 998. And seventh, it contends the court erred by denying its motion for new trial.

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

2

SureTec contends JMR cannot prevail against SureTec because JMR failed to declare EAR in default under the subcontracts, and JMR failed to notify SureTec of any such default. It also contends the order finding JMR entitled to attorney fees on EAR's cross-complaint was improper as to SureTec. Further, it contests the award to JMR of expert witness fees under section 998. And it argues that SureTec's liability must be limited to a maximum of $471,881, the ceiling of its liability under the performance bond on the plumbing subcontract.

In the published portion of this opinion, we conclude the court did not err in its utilization of the *Eichleay* method to calculate extended home office overhead damages and in its use of the modified total cost method of calculating JMR's disruption and delay damages. We also hold the court did not err in finding SureTec liable under the performance bonds, concluding that formal notice of EAR's default was not a condition precedent to JMR's recovery under the bonds. In the unpublished portion of this opinion, we conclude (1) there was substantial evidence supporting the court's finding that EAR was liable to JMR for Project delays; (2) the court's statement of decision was not defective; (3) defendants' challenges to the interim, nonfinal, postjudgment order determining that JMR was entitled to recover attorney fees in defending the cross-complaint are not cognizable at this time; (4) defendants' challenges to the award of JMR's expert witness fees under section 998 are meritorious; (5) EAR's claim that the court abused its discretion in denying EAR's motion for new trial has no merit; and (6) SureTec's request for an order that its maximum liability is $471,881 is not cognizable because it is a request for an advisory opinion. Accordingly we will affirm the judgment, reverse the order awarding expert witness fees, and remand the case for further postjudgment proceedings consistent with this opinion.

PROCEDURAL BACKGROUND

On April 29, 2010, JMR filed its complaint against EAR and SureTec. JMR alleged four causes of action: (1) breach of the plumbing subcontract; (2) enforcement

3

and foreclosure on the performance bond for the plumbing subcontract; (3) breach of the electrical subcontract; and (4) enforcement and foreclosure on the performance bond for the electrical subcontract. The first and third causes of action were alleged against EAR, while the second and fourth causes of action were alleged against SureTec.[2] JMR alleged that EAR's failure or refusal to perform its work under the two subcontracts in accordance with the Project's schedule "caused project delay, acceleration, and related damages to JMR." The alleged damages included "offset of JMR claims against the Owner, increased cost of JMR on-site performance costs and other loss of cost recovery and overhead on the Project." In each of the four causes of action, JMR claimed its damages were in an amount "not less than $200,000.00."

EAR filed a cross-complaint against JMR alleging breach of contract and common counts. It alleged in separate causes of action that JMR had breached the electrical subcontract and plumbing subcontract, and that as a result of these breaches, EAR had been damaged in an amount in excess of $108,913.31.

A five-day court trial took place in January 2012. After the parties submitted posttrial briefs in lieu of final argument, the court issued a ruling on April 30, 2012, finding in favor of JMR in the total amount of $379,318, which amount included a deduction of $121,893 that had been previously withheld from EAR under the subcontracts. The court further ordered that EAR take nothing on its cross-complaint.

Pursuant to the court's request, JMR submitted a proposed statement of decision in which it withdrew one of its claims and adjusted the amount of another claim, resulting in revised damages award of $315,631. The damages were derived by (1) adding five damage figures in amounts of $29,249 (air compressor), $132,168 (field overhead for delay), $15,440 (field overhead for Project closeout), $14,244 (markup for field

---

[2] JMR also sought in the second and fourth causes of action to foreclose on the payment bonds issued by SureTec under the two subcontracts. The payment bonds are not at issue in this appeal.

4

overhead), $60,693 (*Eichleay* home office overhead), and $185,730 (damages during framing and drywall phase); and (2) subtracting from this amount $121,893 previously withheld under the subcontracts. On July 19, 2012, the court signed the statement of decision. On August 14, 2012, the court entered judgment in favor of JMR and against defendants in the amount of $315,631. The court also ordered that EAR and SureTec take nothing on the cross-complaint[3] and that defendants were liable for JMR's costs, including attorney fees in defending the cross-complaint, in an amount to be determined after appropriate filings by JMR.

In postjudgment proceedings (discussed in greater detail, *post*), the court issued an order on November 13, 2012, granting JMR's request for recovery of expert fees of $90,644.07. In the same order, the court reaffirmed a prior tentative ruling that it would award attorney fees to JMR for its successful defense of EAR's cross-complaint in an amount to be determined at a later time.

DISCUSSION

## I.     *EAR's Appeal of the Judgment*

EAR asserts four challenges to the court's judgment. First, it contends there is no substantial evidence to support the court's finding that EAR breached its subcontracts with JMR. Second, it argues the court erred in using the *Eichleay* formula of calculating home office overhead damages. Third, it claims the court erred in applying the modified total cost method of damages in connection with alleged delay damages associated with the interior installation of metal studs and drywall (hereafter, the framing and drywall phase). And fourth, it argues the court's statement of decision was defective in that it failed to take into consideration essential matters of fact and law. We address each of these contentions below.

---

[3] The finding that SureTec take nothing on the cross-complaint appears to be in error, since EAR was the sole cross-complainant.

5

A.      Sufficiency-of-Evidence Challenge

    1.      *JMR Evidence*

        a.      Testimony

On July 25, 2006, the Corps notified JMR that it had been awarded the contract to complete the Project at a total contract price of $6,691,000 (the prime contract). Thereafter, on September 19, 2006, JMR and EAR executed the subcontract for electrical work for a total contract price of $732,500. On November 14, 2006, JMR and EAR executed the subcontract for plumbing work for a total contract price of $471,881. Both subcontracts recited that the schedule for performance of the prime contract was 450 days from the "Owner's Notice to Proceed Date [of] 8/30/06," thereby making the completion date November 23, 2007. EAR acknowledged these "contract durations and time constraints and [agreed it would] comply with [JMR's] construction schedule."

Work on the Project continued nearly six months passed the scheduled completion date of November 23, 2007. The beneficial occupancy date—i.e., completion of the Project—was May 14, 2008.

Several representatives of JMR and one JMR-retained expert testified that EAR was responsible for concurrent delays on the Project. Ron Rivard, JMR's Vice President, testified that the Project was delayed and the Corps, through change orders, granted a 180-day extension of the Project completion date. The Corps was responsible in part for the extension due to delays in approval of the landscaping plans. Rivard also testified that three subcontractors—EAR, Countywide Mechanical (Countywide), and Del Monte Glass (Glass)—contributed to delays, but he did not know the number of delay days caused by each of the three subcontractors, saying "[t]hat's up [to] the experts."

Rivard testified that one aspect of EAR-caused delay involved the furnishing of an air compressor. EAR initially disputed that an air compressor was included in its scope of work under the plumbing subcontract, but it eventually supplied an air compressor without producing a submittal beforehand. Submittals were required on the Project so the

6

Corps could give advance approval of the equipment. The air compressor was not approved by the Corps, and EAR refused to provide a Corps-approved replacement compressor. JMR thereafter procured and installed a Corps-approved compressor. Rivard testified that EAR's failure to supply an approved air compressor caused delay in JMR's performance under the prime contract. He testified the schedule called for the air compressor to be supplied in October 2007. Instead, it was supplied in February or March 2008.

Steven Hupaylo, JMR's job superintendent for the Project from its inception to August 2007, was responsible for managing and coordinating the subcontractors in the field. Hupaylo testified the drywall work for the interior of the clinic did not go well. JMR's plan was to install metal framing, have EAR do its plumbing and electrical work in the uncovered metal frame, and then cover the metal frame along with the plumbing and electrical work with drywall. JMR had separated the building into three areas, with the intention of going room-by-room to have this work done efficiently. According to Hupaylo: "We had a good shot at doing the thing. And the biggest problem we had was . . . the plumbing and electrical that held us up in the [P]roject [by] not having materials, not having skilled people, [and] not having any people sometimes. That was the single biggest issue." Hupaylo also testified that EAR's plumbing crew "left the site a lot" and were often working at other locations on the base. EAR's foreman would sometimes show up on the site without materials; he would promise to return to the site the next day, but would not. As a result of ongoing problems with EAR's performance under both subcontracts, JMR had to install the drywall in a piecemeal fashion.

Daniel Spade worked as JMR's project manager from January 2007 until the Project's completion. Spade testified there were significant punch list items at the end of the Project resulting from EAR's deficient performance under the subcontracts. In addition, aside from the air compressor issue, there were problems with (1) an undersized

7

water heater, (2) the mixing valves controlling hot and cold water, and (3) the improper operation of the fire alarm and life safety system.

JMR also presented testimony from John Elmer, a construction management expert with expertise in scheduling. JMR retained Elmer to review the schedule for the Project, to identify whether there were any delays in the Project's completion, and to determine the causes of any delays. Elmer testified regarding concurrent delays on the Project. Defendants did not challenge Elmer's qualifications as an expert.

Elmer testified that for any construction project, the owner and the general contractor agree to an initial construction schedule—a baseline schedule. The general contractor prepares a baseline schedule after receiving input from the subcontractors. The general contractor then submits the baseline schedule to the owner for approval. The baseline schedule is regularly tracked as work proceeds, typically through a computerized program. If there is a delay in the delivered date of any work, and the delay is on the critical path—i.e., the longest path of activities required to complete the project—that delay will extend the completion date of the Project.

In arriving at his opinions as to any delays to the baseline schedule, Elmer reviewed a number of construction documents, including monthly schedule updates, daily quality control reports, daily subcontractor reports, submittal logs, punch lists, and correspondence. In his analysis of the critical path of the Project, Elmer also created an as-built schedule from December 2007 to May 2008 to attempt to identify accurately the progress of the work on the Project as compared with the baseline schedule. He created this as-built schedule because the monthly schedule updates in the latter months of the Project did not accurately reflect the status of work being performed.

Elmer opined there was a critical path delay that extended the Project's completion by 180 days. That delay was reflected in change orders from the Corps extending the completion date of the Project. Elmer testified that the parties responsible for the delays were the Corps and three subcontractors: EAR, Countywide, and Glass. He opined that

8

EAR and Countywide were concurrently responsible for 142 of the 180 days of delay, and that of those 142 days, Glass was concurrently responsible for 28 days of delay.

Elmer also testified that from December 19, 2007, to May 14, 2008 (the beneficial occupancy date), the commissioning of the life safety systems (operable heating ventilating and air conditioning, smoke detector, and fire alarm systems) drove the critical path. "Commissioning" involved these systems being "signed off as being complete and operable" and was a precondition for the owner accepting beneficial occupancy. Elmer testified that EAR, Countywide and, to a much lesser extent, Glass were the subcontractors performing work relevant to the completion of these systems. He also said the concurrent delays by Countywide did not delay EAR's work on the life safety systems, and he opined that JMR did not contribute to any delay in the completion of the Project between December 2007 and May 14, 2008.

b.  Documentary Evidence

JMR introduced documentary evidence showing EAR was responsible for Project delays. Most of the written communications were from Daniel Spade, JMR's project manager. Spade addressed some of the communications directly to John Fieri, EAR's plumbing project manager. Most of the written communications not addressed to Fieri listed Fieri as a "cc" recipient. As noted twice by the trial court in its statement of decision, Fieri was not called by EAR as a witness at trial.

On July 11, 2007, Spade advised EAR in an email to Ravindra Pendurthi, EAR's owner, that EAR had, in contravention of the specifications, used laborers instead of plumbers to install pipe. Spade also noted that "an entire wage review of [EAR] on the [P]roject [was] likely," and he directed that Pendurthi "get [his] company in compliance."

On August 10, 2007, Spade wrote a letter to Pendurthi indicating that (1) EAR was "well behind schedule on the interior walls in the building"; (2) pipe insulation had "not been completed[,] preventing completion of the drywall in many areas"; (3) "[t]he gas lines ha[d] not been run and therefore drywall in some areas will have to be removed and

9

replaced at EAR's expense"; (4) EAR had not delivered soffit light fixtures on-site, "preventing covering these areas"; (5) "lobby wall sconces [we]re not on site[,] preventing completion of rough-in"; and (6) EAR was responsible for deficient submittals (about which JMR had previously notified EAR), and EAR's failure to correct the deficient submittals had resulted in the Corps withholding funds due to JMR. Spade also summarized that "EAR['s] plumbing performance [was] substantially behind and [was] severely impacting the schedule and the timely completion of the [P]roject." Spade advised EAR that it had "48 hours to properly man the [P]roject with qualified plumbers."

Spade sent EAR two follow-up emails in September 2007. In those emails, he stated the Corps was "not approving anymore [*sic*] money for plumbing and electrical work done last month because submittal items ha[d] not been completed." Spade also reiterated that the Corps was "holding money from last month[']s billing."

On October 28, 2007, Spade sent an email to EAR that listed incomplete plumbing and electrical items, stating "[s]ome of these items are having impacts and almost all are overdue." On November 21, 2007, Spade sent another email to Pendurthi, indicating there were "[m]ajor issues still outstanding," and stating: "We have run out of time waiting for your electrical submittals to be turned in . . . . This is a serious problem in that it could impact closeout of the [P]roject. If this occurs[,] EAR will be held responsible for JMR's overhead costs and any associated damages."

On December 7, 2007, Spade sent another email to Pendurthi about EAR's delays and problems with Project submittals. Earlier that day, the Corps had advised JMR that the Corps had in the past retained a portion of contract payments based upon "excessive outstanding submittals; progression of work without proper quality controls; and slippage of the approved [P]roject schedule." The Corps also noted that "many of these deficiencies ha[d] not yet been resolved." Spade advised Pendurthi that "EAR ha[d] been responsible for a significant amount of the production delay and 5 pages out of the 11

10

pages of outstanding submittals." He also noted that "almost all" of the electrical submittals and some of the plumbing submittals were still outstanding.

On January 14, 2008, Spade advised EAR by email that the Corps had not granted beneficial occupancy of the building because there were outstanding issues concerning the mechanical system. Spade said "[t]he majority of the [outstanding] items are EAR's responsibility." He indicated the items needed to "be resolved this week." And he said: "You have already been informed of the financial impact involved. The fact that these items are weeks old and still not resolved are major issues to the [C]orps[,] home office."

On January 21, 2008, Spade sent a letter to Fieri stating "[t]here [were] a number of major items that ha[d] been on the Quality Control punchlist for over a month," and the Corps was citing to the major items as a reason for denying beneficial occupancy. Spade sent another email to Fieri on February 29, 2008, advising there were "still a number of [punch list] items to resolve. Some on the plumbing side[,] others on the electrical . . . . There are still a large number of electrical submittals[,] which is a huge issue."

On March 19, 2008, Spade sent another email to Fieri noting there were still a number of punch list items to be addressed. Spade indicated: "The simple fact is EAR is working on other projects and is not completing this work. [¶] No one is on[-]site addressing these items. Every time Bob [Clark of the Corps] visits[,] he finds something new." Spade also wrote: "We have been struggling with EAR's installation of the plumbing system; clean outs have not been installed, goose neck vents not installed, plumbing venting not installed per plan and requiring shop drawings prior to installation, medical gas pipe not brazed per specification (still a sore point with the Corps), DDC valve not installed per civil plan . . ., and payroll issues. [¶] The biggest issue on the electrical side has been the submittals, which are still not complete and over 1 year late."

11

### 2. EAR's Evidence

Ravindra Pendurthi, EAR's owner, testified that EAR started plumbing work on the Project in late September or early October 2006, even though the subcontract was not formally executed until December 2006. He said EAR commenced electrical work on the Project in or about September 2006, before that subcontract was executed. He testified that EAR started work early at JMR's urging, because JMR was "behind schedule" on the Project.

According to Pendurthi, JMR was slow in providing EAR with a baseline schedule for the Project. He said JMR did not provide it until March 2007. He acknowledged that at the time, EAR responded in writing that the schedule was fine, but that its compliance with it was dependent on timely work by other tradesmen whose work needed to be completed before EAR's.

Pendurthi described several tasks that were added to its scope of work under both subcontracts which extended EAR's time to complete its performance. He also testified that JMR approved change orders for this additional work, but JMR did not formally grant EAR extensions of time. Instead, in each instance, the JMR representative (either Spade or Hupaylo) advised EAR that JMR was behind schedule but would "take care of [EAR's extension request] at the end of the [P]roject."

Pendurthi testified there was a period of time in which EAR inquired of JMR about the equipment JMR was going to provide that impacted EAR's rough-in plumbing work. He said JMR's delay in providing this information interfered with EAR's ability to complete its work.

Pendurthi denied that EAR lacked sufficient materials or failed to supply sufficient personnel to work on the Project. He also denied that EAR's work crews on the Project were pulled off the job to do other work. He claimed EAR had dedicated crews for the Project. He acknowledged that EAR's foreman sometimes did not show up to work

12

because he had a persistent gout problem. But, he said, EAR eventually addressed the issue by replacing the foreman.

Pendurthi testified that much of the drywall work—particularly the work in the x-ray room and dentures room—was done out of sequence and was hampered because JMR did not have proper submittals. He said this caused delays in EAR's performance. Pendurthi also testified that the drywall cost was elevated and its time of completion was lengthened because the Corps required a "level five finish," which was a quality much more difficult to achieve than a normal sheetrock job. In addition, JMR used an out-of-town workforce that resulted in cost overruns. Pendurthi admitted on cross-examination that EAR did not advise JMR in writing that JMR was causing delays in EAR's performance.

Pendurthi also testified there was a period of time in or about November 2006 when JMR did not have on-site quality control personnel as required by the Corps. JMR asked for help from EAR, and EAR supplied quality control personnel to work on-site for approximately one month. Pendurthi testified that JMR's failure to have on-site quality control personnel for a period of time delayed EAR's performance.

According to Pendurthi, all of EAR's work under both subcontracts was accepted. Pendurthi testified that by November 30, 2007—according to applications for payment EAR had submitted—EAR's plumbing and electrical work were 98.66 percent and 96.36 percent completed, respectively. Pendurthi testified that after December 1, 2007, EAR's remaining work was "[m]ostly finish work" during which time EAR was waiting for other trades to complete their work.

### 3. *Substantial Evidence Standard of Review*

As a fundamental proposition, a judgment or order is presumed correct on appeal. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court of Los Angeles County*

13

(1970) 2 Cal.3d 557, 564.) It is appellant's burden to overcome this presumption of correctness, which burden includes providing an adequate record demonstrating error. (*Ibid.*; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:17, pp. 8-5 to 8-6, rev. #1, 2013.) The doctrine of implied findings is "a natural and logical corollary" to (1) the presumption of the correctness of the judgment, (2) the fact that all intendments and presumptions are made in favor of that correctness, and (3) the appellant's burden of demonstrating error with an adequate record. (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) This "doctrine . . . requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. [Citation.]" (*Ibid.*; see *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded by statute on other grounds as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449.)

A disputed factual issue that has been resolved by the trial court is reviewed under the substantial evidence standard. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) As the California Supreme Court has explained: "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 (*Crawford*); see also *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651-652.)

Upon review of the record in its entirety, "all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be

accepted as true, and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact.  If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed."  (*Estate of Teel* (1944) 25 Cal.2d 520, 527.)

The benchmark "substantial evidence" is not "synonymous with 'any' evidence." (*People v. Bassett* (1968) 69 Cal.2d 122, 139.)  As one court has explained:  "While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment.  The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court.  A decision supported by a mere scintilla of evidence need not be affirmed on review.'  [Citation.]  '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence.  It must be reasonable . . . , credible, and of solid value . . . .'  [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.  [Citation.]  While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]."  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633, footnote omitted, italics original.)

It is the appellant's burden to establish that the judgment is not supported by substantial evidence.  (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1011.)  In meeting that burden, the appellant is charged with presenting an adequate record from which the error is demonstrated.  (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) "Defendants raising a claim of insufficiency of the evidence assume[] a 'daunting burden.'  [Citation.]"  (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.) In assessing whether substantial evidence supports the trial court's factual findings, we consider the evidence in the light most favorable to the party prevailing below.  (*Plumas*

*County Dept. of Child Support Services v. Rodriguez* (2008) 161 Cal.App.4th 1021, 1026.)

### 4. Procedural Bar

As noted earlier, where the claim is the absence of sufficient evidence to support the judgment, it is the appellant's burden—not the respondent's or the court's—"to identify and establish deficiencies in the evidence. [Citation.]" (*Houng Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Houng Que*); see also *Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 14-15.) " 'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his [or her] brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.' " (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent"].)

Moreover, "the burden [of appellant] to provide a fair summary of the evidence 'grows with the complexity of the record. [Citation.]' [Citation.]" (*Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1658 (*Boeken*).) Thus, an appellant's recitation of only the evidence supporting its position does not comply with the requirements of an appellant's sufficiency-of-the-evidence challenge, and may result in the appellate court disregarding the claim. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.)

EAR has not met its burden as appellant to provide a summary of the material evidence (including evidence favorable to respondent JMR) concerning the claims litigated in the court trial. This failure is particularly pronounced in light of the wealth

and complexity of the evidence adduced at trial.  (See *Boeken*, *supra*, 127 Cal.App.4th at p. 1658.)  For instance, as seen from the recitation of facts, *ante*, there was a significant amount of evidence presented by JMR—through the testimony of four employees or former employees (Rivard, Hupaylo, Spade, and Thornton)—that EAR's performance under the two subcontracts hindered JMR's ability to complete the prime contract and significantly delayed completion of the Project.  Yet EAR, in its opening brief, does not mention that Hupaylo, Spade, or Thornton testified.  EAR also fails to present Rivard's testimony that is unfavorable to EAR's position, such as Rivard's testimony that EAR's failure to install the air compressor caused significant delays to the Project.  EAR's "selective recitation of the record . . . is manifestly deficient," and we may therefore treat its claim of error as waived.  (*In re Marriage of Fink*, *supra*, 25 Cal.3d at p. 887.)  But even if we were to consider EAR's sufficiency-of-the-evidence challenge as having not been waived, it nonetheless lacks merit.

> 5.      *Substantial Evidence Supports the Trial Court's Findings*

JMR presented evidence from multiple sources that EAR's breaches of the subcontracts were a concurrent cause in the delay of the completion of the Project.  Steven Hupaylo, JMR's job superintendent, testified that JMR's drywall work was delayed by EAR's performance.  According to Hupaylo, JMR's planned, methodical approach to building out the interior was "held . . . up . . . [by EAR's] not having materials, not having skilled people, [and] not having any people sometimes.  That was the biggest single issue."  Because of the ongoing problems with EAR's performance under both subcontracts, JMR had to complete the drywall work in an inefficient, piecemeal fashion.  Documentary evidence presented by JMR—including a number of written communications from Spade to EAR—confirmed that (1) EAR's plumbing and electrical work was behind schedule; (2) some of EAR's plumbing work was done contrary to specifications; (3) EAR had performed work without proper quality controls; (4) EAR had failed to timely deliver certain electrical products, thereby delaying the

17

Project; (5) EAR was responsible for multiple deficient or late submittals that resulted in the Corps withholding payment under the prime contract; and (6) EAR was responsible for numerous punch list items as of January 2008 that, two months later, it had not yet addressed. Spade also confirmed in his testimony that EAR's deficient performance under both subcontracts had resulted in several significant punch list items at the end of the Project. And Rivard testified that EAR's failure to supply the air compressor delayed JMR's performance under the prime contract. Furthermore, JMR's retained construction management expert, John Elmer, gave detailed testimony concerning EAR's responsibility for concurrent delays on the Project. Elmer opined that of the 180 days of critical path delay, EAR was concurrently responsible for 142 days of delay. EAR neither challenged Elmer's expert qualifications nor presented its own expert testimony to contradict Elmer's opinions.

In urging there was no substantial evidence supporting the judgment, EAR emphasizes the testimony of its owner, Pendurthi. EAR argues that "Pendurthi provided clear, positive and rationally believable testimony that the Project delays . . . were caused in whole or in part by JMR itself." It cites to Pendurthi's testimony that delays related to the drywall installation and to time and cost overruns were due to matters chargeable to JMR—i.e., the difficulty of achieving "level five" drywall finish and JMR's choice of using expensive, out-of-town labor. But as trier of fact, "[t]he trial court [was] the exclusive judge of the credibility of the witnesses." (*People v. Duncan* (2008) 160 Cal.App.4th 1014, 1018; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:54, p. 8-26.) The court was therefore free to discount or reject Pendurthi's testimony as self-serving, lacking in specifics, or otherwise lacking credibility. (See *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 [appellate court cannot substitute its assessment of witnesses' credibility for the trial court's credibility assessment].) It is clear the trial court did not credit Pendurthi's testimony, finding in the statement of decision, for instance, that (1) "Pendurthi's contrary conclusory explanations

18

[regarding disruption and delay caused by EAR in the framing and drywall phase we]re not credible"; (2) "Pendurthi's conclusion that JMR's alleged late finishing of the drywall delayed EAR's work [wa]s illogical"; and (3) EAR's failure to produce documentary evidence "to support Mr. Pendurthi's testimony renders [his] testimony weak and unreliable."[4] The court thus accepted the evidence presented by JMR—particularly Hupaylo's testimony—concerning delays caused by EAR in connection with the metal framing and drywall phases of the Project. Further, while EAR stresses Pendurthi's testimony that JMR's failure to have on-site quality control personnel for a period of time in the fall of 2006 caused delay, the trial court could have minimized or rejected this testimony as well. Indeed, there was no evidence that this delay early in the Project, assuming its existence, was a delay under a critical path analysis.

EAR also argues that JMR's damages expert, Juan Perez, provided testimony negating JMR's claim that EAR was responsible for delaying the project: EAR argues that Perez "testified that **JMR** was the cause of concurrent Project delays—upwards of 75% responsibility during a time in August 2007—for failing to timely submit outstanding Project submittals." (Original emphasis.) But the date cited by EAR is misstated. The correct date is August *2008*, three months *after* the Corps accepted the Project. Perez called the several-months period after beneficial occupancy (May 14, 2008) the "Project Closeout" period. And to the extent EAR's argument is that Perez's damage calculation testimony should be disregarded because he admitted that JMR had "upwards of 75% responsibility" for delays in the critical path timeline, JMR conflates

---

**4** The court, in its statement of decision, specifically rejected other testimony presented by Pendurthi, including his assertion that there were precontract discussions in which the parties plainly agreed that supplying an air compressor was outside the scope of EAR's duties under the plumbing subcontract. Pendurthi testified at length concerning this issue. But because EAR does not challenge the trial court's finding against EAR and its award of damages to JMR concerning the air compressor, we do not recite that testimony here.

19

two distinct parts of Perez's testimony.  As discussed, *post*, Perez opined that EAR was responsible for at least 75 percent of the delay damages sustained by JMR during the 142-day period in which EAR and another subcontractor, Countywide, were concurrently responsible for delays in the critical path timeline.  Based upon EAR's responsibility for delays during this 142-day period, Perez calculated damages in the form of field overhead and *Eichleay* damages.  The "Project Closeout" was a period of 13 weeks *after* the 142-day concurrent delay period.  Perez testified that during this period when the Project was winding down, there were a number of outstanding contractor submittals.  Perez, on a week-by-week basis, determined the total number of submittals on the Project, the number of outstanding EAR submittals, and then multiplied EAR's percentage of total submittals by the total weekly field overhead.  During the third week of May 2008, for example, the total field overhead was $6,641.73, EAR was responsible for 43 percent of the outstanding submittals (36 of 84) during that week, so EAR's proportional liability for the week was $2,855.94.  During two weeks of August 2008, there were four outstanding submittals—one was EAR's and three were JMR's.  Perez therefore allocated 25 percent of the weekly overhead to EAR for each these two weeks.  The fact that Perez determined that JMR had 75 percent responsibility for delays during two weeks of August 2008—and calculated damages based upon EAR's 25 percent responsibility during that period—has nothing to do with Perez assessment of damages based upon EAR's concurrent delay responsibility for the 142-day period *preceding* the Corps's acceptance of beneficial occupancy of the Project on May 14, 2008.

In addition to challenging the sufficiency of the evidence of causation for the delay, EAR argues, in one sentence of its opening brief, that JMR "was unable to provide substantial evidence as to any Project delay damages allegedly attributable to EAR."  We need not address this conclusory, undeveloped legal argument.  (*Tilbury Constructors, Inc. v. State Compensation Ins. Fund* (2006) 137 Cal.App.4th 466, 482 [appellate arguments raised in perfunctory fashion are deemed forfeited].)  We conclude EAR has

20

failed to sustain its burden of showing there was insufficient evidence to support the judgment.

## B. Challenges to the Calculation of Contract Damages

In the alternative to its sufficiency-of-the evidence challenge, EAR contests the court's acceptance of the *Eichleay* formula of recovering home office overhead damages. EAR also contends the court erred in applying the modified total cost method of calculating the cost associated with delays in the framing and drywall phase of the Project. We will address these two challenges after first identifying the appropriate standards of review. At the outset, however, we will present a summary of the evidence concerning JMR's claims of damages.

### 1. *Evidence Concerning Damages*

JMR presented evidence of damages that involved four categories: (1) field overhead delay damages; (2) home office overhead (*Eichleay* delay damages); (3) delay damages associated with the framing and drywall phase of the Project, utilizing the modified total cost method; and (4) costs associated with EAR's failure to supply an approved air compressor. We will not summarize the air compressor damages, since they are not at issue in this appeal. But given their interrelationship with the *Eichleay* delay damages, we will review the evidence of field overhead damages even though those damages are not directly challenged by EAR.

#### a. Field Overhead Damages

Daniel Spade, JMR's project manager, testified that the Corps had rejected JMR's recovery of any extended overhead damages resulting from delays in the Project's completion. The Corps rejected these damages because there were concurrent delays caused by parties other than the Corps. At trial, JMR's construction management expert, John Elmer, explained that when the owner of a public works project causes delay, and a subcontractor or subcontractors concurrently cause delay, the owner may grant the general contractor an extension of time to complete the project, but it will not grant the

21

general contractor compensable time (i.e., delay damages payable by the owner). Elmer testified that under such circumstances, the general contractor will typically seek delay damages from the subcontractor, under the theory that the general contractor "should have recovered compensable time, but . . . was precluded from [doing so] because of [the subcontractor's] delay."

Juan Perez, a construction expert retained by JMR, provided extensive testimony regarding JMR's delay damages attributable to EAR. Defendants did not challenge Perez's qualifications as an expert. Perez testified that he has had experience in presenting disruption claims on behalf of contractors. A disruption claim is based upon a contractor's intended performance or method of performance being impacted by another contractor or by an event, resulting in the contractor's performance being more costly because it is either done out of sequence or for an extended duration.

Perez calculated JMR's damages based upon (1) his review of the project documents, and (2) his reliance upon the opinions of John Elmer, JMR's construction management expert. Specifically, Perez relied upon Elmer's opinions that (1) there was a critical path delay that extended the Project's completion by 180 days; (2) 180 days is reflected in change orders issued by the Corps extending the Project's completion date; (3) the parties responsible for the delays were the Corps and three subcontractors (EAR, Countywide Mechanical, and Del Monte Glass); (4) EAR and Countywide were each concurrently responsible for 142 days of the 180 days of delay; (5) within the 142-day period, Del Monte Glass was concurrently responsible for 28 days of delay.

Perez opined that, under the two subcontracts combined, EAR was responsible for at least 75 percent of the delay damages sustained by JMR during the 142-day concurrent delay period identified by Elmer. Perez arrived at this percentage allocation after considering (a) Elmer's allocation of EAR's responsibility for concurrent delays (63 percent); (b) a determination of EAR's percentage of the total contract value of the

22

mechanical, electrical, and plumbing trades (67 percent); and (c) the percentage of punch list items for the 142-day concurrent delay period (83 percent).

Perez also rendered the opinion that JMR sustained field overhead damages associated with EAR's concurrent delay. Field overhead costs are the costs a contractor incurs in maintaining its field operations, including cost items such as storage trailers, office trailers, and a job superintendent's salary. Perez concluded that JMR's total field overhead damages for which EAR was responsible was $161,851.33.

### b. Home Office Overhead Damages

Perez testified that he calculated damages for JMR's home office costs (otherwise known as unabsorbed overhead costs) using the *Eichleay* formula. Perez explained that this formula "is a method of allocating those home office overhead costs to a project that [has] been extended or delayed." According to Perez, the *Eichley* formula is the "exclusive method approved by the Federal Government to arrive at the fair compensation amount for unabsorbed overhead costs." He testified that "[b]ut for the concurrent delays on the project, the *Eichleay* [f]ormula would have been used by both JMR and the Government to arrive at the fair compensation amount for unabsorbed overhead costs that belonged to JMR."

### c. Framing and Drywall Phase Damages

JMR qualified its vice-president, Ron Rivard, as an expert witness in estimating interior framing and drywall work. Rivard had over 30 years' experience as a licensed general contractor, and approximately 35 years as an estimator in which he had estimated at least 300 jobs.

Rivard testified that he prepared the bid for the framing and drywall phase of the Project. In doing so, he utilized the plans in an electronic format and used computer software to perform a detailed cost takeoff. The takeoff yielded a bill of materials, and the software automatically assigned a labor factor indicating the number of labor hours associated with the particular area of work. The labor factor was based upon historical

23

data, i.e., JMR's experience in constructing buildings similar to the building in the Project. The total bid for the framing and drywall phase was $220,000, an amount JMR assumed would be sufficient to perform the work in an orderly fashion and with a reasonable crew size. Rivard testified he was unaware of any mistakes in the bid, and opined that $220,000 was a reasonable cost for that phase of the Project.

Craig Connerty, a certified public accountant with 27 years of experience, testified as an expert on JMR's behalf. JMR had been a client of Connerty's accounting firm for over 15 years. Connerty reviewed the costs posted in JMR's books allocated to the framing and drywall phase of the Project. He testified that the total costs allocated to this phase was $461,535, and he reviewed the subcategories of those costs. Connerty "did a lot of testing with regard to the accounts for reasonableness" by selecting a number of different invoices for review before arriving at the $461,535 figure. Connerty also noted that this figure should be reduced by approximately $48,200 to account for costs that, based upon his conversation with Rivard, were erroneously posted to the framing and drywall phase.

Perez offered testimony relating to disruption damages for the framing and drywall phase. In forming his opinion, Perez spoke with job superintendent Steven Hupaylo, project manager Daniel Spade, and JMR's vice president Ron Rivard. Perez also reviewed documents identifying the costs of the framing and drywall phase; certified payroll figures indicating the number of workers on the job site during that phase; and other correspondence. Perez relied on Hupaylo's testimony to the effect "that every wall was impacted by EAR's performance, meaning that the impacts and the costs [were] intrinsically intertwined [and it was] difficult if not impractical or impossible to segregate [the] individual impacts." In calculating disruption damages, Perez performed a "modified total cost analysis." He described this approach as follows: "[Y]ou would take a selected portion of the contractor's costs that he incurred and subtract from that the

24

contractor's budget for those items, removing . . . items which were not part of the original budget . . . to ensure you're comparing apples to apples."

Thus, one component of Perez's calculation was the original bid. Perez did an independent analysis of JMR's bid for the framing and drywall phase. He found that Rivard's bid contained the kind of detail indicative of a good estimate, the bid used methods that were "consistent with other contractors," and the bid was "based on historic[al] information[,] which is also important." Perez testified that he "was satisfied" with Rivard's bid and that the numbers within it "appeared reasonable." He noted that in comparing the material costs in the bid with the actual material costs, "the material estimate was almost dead on." He also noted that because labor estimates are based upon the material scheduled, the fact that the actual cost of materials was consistent with the estimate for those materials was "a good indication of a good estimate." He concluded that "if your material estimate is off, your labor estimate would be off. And Mr. Rivard's material estimate was on, was accurate."

Perez also reviewed the "logged" costs that related to the framing and drywall phase of the Project. This amount totaled $461,534. Perez subtracted the costs that had been incorrectly allocated to the framing and drywall phase. These were the same figures identified in the testimony of JMR's accounting expert, Craig Connerty. Perez also subtracted a per diem figure associated with the erroneously posted costs. Perez then calculated the total amount of disruption damages allocable to EAR relating to the framing and drywall phase, which he determined to be $185,729.

### 2. *Standards of Review*

An appellant's challenge to damages, depending upon its specific nature, may be subject to a substantial evidence, abuse of discretion, or de novo standard of review. The question of whether a plaintiff was, in fact, damaged by the defendant's breach of contract is reviewed for substantial evidence. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 (*GHK*).) The question of whether "a certain measure of

25

damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review. [Citation.]" (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 (*New West*); see also *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 579.) But where the measure of damages is legally permissible, a trial court's choice of that measure, among other legally permissible measures of damages, is reviewed for abuse of discretion. (*New West*, at p. 843, citing *GHK*, at p. 873.)

EAR contends that neither the *Eichleay* formula nor the modified total cost method was legally authorized in this case. EAR does not make the further argument that, assuming the legal validity of these damage calculations, the court abused its discretion by selecting them over other legally permissible methods of computing damages. Accordingly, we review the legal propriety of the court's use of the two damages calculations de novo. In addition, EAR contends that, even assuming the legal validity of the *Eichleay* formula, JMR failed to establish the requisite elements for its application, a question we review under the substantial evidence standard of review.

### 3. Challenges to the Eichleay *Formula*

#### a. The *Eichleay* Formula

As explained by JMR's expert, Juan Perez, the *Eichleay* formula "is a method of allocating those home office overhead costs to a project that [have] been extended or delayed." It originated from a case before the Armed Services Board of Contract Appeals (see *Eichleay Corp.* (A.S.B.C.A.1960) 60-2 BCA (CCH) 2688), and it is typically used in federal litigation involving federal public works projects. (See, e.g., *P.J. Dick Inc. v. Principi* (Fed.Cir.2003) 324 F.3d 1364, 1370; *Altmayer v. Johnson* (Fed.Cir.1996) 79 F.3d 1129, 1132-1133 (*Altmayer*).) The Federal Circuit has held that "the *Eichleay* formula is the *only* means for calculating recovery for unabsorbed home office overhead." (*E.R. Mitchell Const. Co. v. Danzig* (Fed.Cir.1999) 175 F.3d 1369, 1372, italics original; see also *Nicon, Inc. v. U.S.* (Fed.Cir.2003) 331 F.3d 878, 884.)

26

As explained by the *Altmayer* court: "Home office overhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. [Citation.] In contracting with the government, a company necessarily includes a portion of home office overhead expenses, which it calculates based on the contract's duration, in its estimate of costs to perform the contract. [Citation.] When the government delays or disrupts contract performance, ultimately requiring that it be extended, the contractor's stream of income from the government for the direct costs it has incurred under the contract is reduced or interrupted. [Citation.] However, home office overhead continues to accrue throughout both the original and extended performance periods, regardless of direct contract activity. [Citations.] This, of course, results in a reduction or interruption of payments for overhead, especially when, as here, the contractor has prepared a critical path schedule, for any delay along the critical path results in the delay of the overall project." (*Altmayer*, *supra*, 79 F.3d at p. 1132.)

There are three steps in the calculation of extended overhead using the *Eichleay* formula. They are (1) "to find [the] allocable contract overhead [by] multiply[ing] the total overhead cost incurred during the contract period times the ratio of billings from the delayed contract to total billings of the firm during the contract period; [(2)] to get the daily contract overhead rate, divide allocable contract overhead by days of contract performance; and [(3)] to get the amount recoverable, multiply the daily contract overhead rate times days of government-caused delay. [Citation.]" (*Wickham Contracting Co., Inc. v. Fischer* (Fed.Cir. 1994) 12 F.3d 1574, 1577, fn. 3 (*Wickham Contracting*).)

### b. Legal Propriety of Using *Eichleay* Formula

EAR argues it was improper for the court to accept JMR's proffer of the *Eichleay* formula to establish its unabsorbed overhead damages caused by EAR's concurrent delay. EAR asserts there is no legal precedent for applying the formula because (1) there

27

have been no published California decisions endorsing its use, and (2) there is no legal authority authorizing its use in situations, such as here, where the defendant causing the delay was not the government. EAR also urges that Perez, JMR's expert, "admitted application of the *Eichleay* formula is 'debated.' "**5**

Under Civil Code section 3300, a party may recover for a breach of contract a sum that will compensate it "for all the detriment proximately caused thereby, or which, in the ordinary course of things, will be likely to result therefrom." "[I]n the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. [Citations.] The aim is to put the injured party in as good a position as [it] would have been had performance been rendered as promised. This aim can never be exactly attained yet that is the problem the trial court is required to resolve. [Citation.]" (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 454; see also *Lewis Jorge Const. Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967-968 (*Lewis Jorge*).) "Where the *fact* of damages is certain . . . the *amount* of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." (*Acree v. General Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398, fns. omitted, italics in original (*Acree*); see also *SCI Cal. Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 570 (*SCI Cal. Funeral Services*).)

---

**5** Perez was asked if there was any criticism of the *Eichleay* formula. He responded: "I'm aware of . . . different cases—certainly *Eichleay* is a formula which is the subject of a lot of cases and the application of *Eichleay* is debated and . . . it's an evolving formula. And I try to keep up-to-date with the evolution of it, but that's what I'm aware of." After again being asked if he was aware of any criticisms of the formula, Perez responded: "Criticisms? Not criticisms more than just the applicability of it—of the formula."

Delay damages are a common element recoverable by a party aggrieved by the breach of a construction contract. (See, e.g., *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603-604 [plaintiffs entitled to damages for increased building costs and loss of use of property resulting from defendants' delay in performance of contract to pave road and install utilities]; *State of California ex rel. Dept. of Transportation. v. Guy F. Atkinson Co.* (1986) 187 Cal.App.3d 25, 32-34 (*Guy F. Atkinson*) [contractor entitled to disruption and delay damages caused by material changes to contract ordered by state]; *Bird v. American Surety Co.* (1917) 175 Cal. 625, 631 [delay damages incurred by owner, including rental losses, recoverable].) A subcontractor who is responsible for delaying the progress of a construction project may be held liable for delay damages incurred by the general contractor or by another subcontractor. (10 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 27:39, p. 109.) Increased overhead expenses incurred by a general contractor as a result of the subcontractor's breach may be an item of recoverable damages. (See *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 344.)

As explained in one treatise: "A building contractor whose performance is delayed by the owner may have increased overhead and fixed costs resulting from a delay and may suffer labor and material cost increases or loss of labor productivity due to delays for all of which he or she would be entitled to damages." (Cal. Attorney's Guide to Damages (Cont.Ed.Bar 2d ed. 2014) § 1.49, p. 1-50.) Extended home office overhead is one type of delay damages for which a contractor may seek recovery. (See Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar 2013) §§ 5.107, 6.86, pp. 394, 537; Gibbs & Hunt, Cal. Construction Law (17th ed. 2011) Construction Claims, § 6.07[F], p. 441.)

We acknowledge there are no reported California appellate decisions approving the use of the *Eichleay* formula. In the only reported California case addressing the formula, the appellate court did not decide the legal propriety of its use because the municipality against which such damages were sought did not dispute the formula's

general applicability to construction delay claims. (See *Howard Contracting, Inc. v. G.A. MacDonald Construction Co., Inc.* (1998) 71 Cal.App.4th 38, 53.)

We do not infer from the absence of California authority that the *Eichleay* formula is unavailable as proof of delay damages in this state. As has been observed in one treatise: "The federal government developed the *Eichleay* formula to compute the amount of home office overhead expense for which a government contractor should be reimbursed for a period of delay. Although the formula has not been discussed in a reported California case, it is frequently used at the trial court level and in arbitration proceedings to compute damages." (Cal. Construction Contracts, Defects, and Litigation, *supra*, § 5.107, p. 394.)[6]

That the circumstances of this case are different from those in which *Eichleay* damages are typically discussed in reported decisions—i.e., the general contractor seeking delay damages *from a subcontractor*, rather than *from a governmental agency/owner*—does not preclude use of the formula. JMR presented unrebutted testimony from Daniel Spade that because there were concurrent delays, the Corps rejected JMR's effort to recover extended overhead damages from the Corps. And JMR's construction management expert, John Elmer, testified that when the owner of a public works project causes delay, but a subcontractor or subcontractors concurrently cause delay, the owner may grant the general contractor additional time but it will not grant the general contractor compensable time (i.e., delay damages). Elmer testified that under such circumstances, the general contractor will typically seek delay damages from the subcontractor under the theory that the general contractor "should have recovered

---

[6] We acknowledge it is stated elsewhere in the treatise that, because California courts have not adopted the *Eichleay* formula in any published decision, "[t]he applicability of [it] to public or private construction projects in California is questionable." (Cal. Construction Contracts, Defects, and Litigation, *supra*, § 6.86, p. 538.)

30

compensable time, but . . . was precluded from [doing so] because of [the subcontractor's] delay." (See *William F. Klingensmith, Inc. v. U.S.* (Fed.Cir. 1984) 731 F.2d 805, 809 [contractor generally denied recovery for government-caused delays where there are concurrent delays and absent " 'proof a clear apportionment of the delay and expense attributable to each . . .' "]; Gibbs & Hunt, Cal. Construction Law, *supra*, Construction Claims, § 6.07[E], p. 440 [where owner causing project delays shows that "simultaneous cause of delay was the contractor's own mismanagement of the project," and delays "contributed to or overlapped the owner caused delays, then they may be considered concurrent and may be treated as noncompensable delays"].) EAR presented no expert testimony of its own to rebut JMR's expert testimony concerning *Eichleay* damages.

We conclude the trial court did not err in applying the *Eichleay* formula as a legally permissible method of determining JMR's home office overhead damages. We base this conclusion upon the expert evidence presented at trial, the general recoverability of extended home office overhead as an element of delay damages, and the federal courts' general acceptance of the *Eichleay* formula. In other words, the calculation of extended home office overhead damages using the *Eichleay* formula was an appropriate method to compensate JMR "for all the detriment proximately caused" by EAR's breach of contract. (Civ. Code, § 3300.) That recovery facilitates "[t]he goal [of placing] the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract. [Citation.]" (*Lewis Jorge*, *supra*, 34 Cal.4th at p. 967, quoting 24 Williston on Contracts (4th ed.2002) § 64:1, p. 7.) Indeed, it would be anomalous to allow recovery to JMR for *Eichleay* extended home office overhead damages in a claim against the government-owner—had there been no concurrent delay and where, as here, JMR had established the fact of such damages and causation—while denying such recovery from EAR where EAR was concurrently responsible for the delay.

31

### c. Proof of Elements of *Eichleay* Formula

EAR also challenges the use of the *Eichleay* formula on the basis that JMR did not establish the requisite elements for its application. The federal courts have identified three *Eichleay* requirements. "[T]he contractor [must] establish: (1) a government-caused delay; (2) that [the contractor] was on 'standby'; and (3) that [the contractor] was unable to take on other work. [Citation.]" (*Altmayer*, *supra*, 79 F.3d at p. 1133.) EAR asserts there was no evidence JMR was unable to take on other work.

JMR presented evidence, through Perez, concerning JMR's inability to obtain other work. Perez's expert testimony was based in large part upon his conversations with Rivard and JMR's bonding agent, Sharon Rusconi. Perez testified that JMR was a woman-owned business that received work on Small Business Administration Section 8A projects. Such projects are not strictly bid competitively; contract awards are largely dependent on the contractor's ratings. Perez testified that as a result of Project delays during the 142-day concurrent delay period, JMR's rating was downgraded to marginal. This rating downgrade negatively impacted JMR's ability to obtain new work. Rivard informed Perez that during the period of November 2007 through sometime in 2008, JMR could not obtain a bid bond. JMR was thus precluded from bidding on public projects and could not get other work.[7]

This evidence constituted substantial evidence of the third *Eichleay* prerequisite, i.e., "that [JMR] was unable to take on other work. [Citation.]" (*Altmayer*, *supra*, 79 F.3d at p. 1133.) Accordingly, EAR's claim that there was insufficient evidence supporting application of the *Eichleay* formula fails.[8]

---

[7] EAR did not assert any evidentiary objections at trial to this testimony, forfeiting any such objections on appeal. (See *SCI Cal. Funeral Services*, *supra*, 203 Cal.App.4th at pp. 563-565 [appellant's challenges to admissibility of expert testimony forfeited due to failure to preserve them in trial court].)

[8] EAR also argues JMR's damages were improperly calculated because Perez included impermissible expenses such as advertising and entertainment as part of its

### 3.     Challenges to Modified Total Cost Method

EAR contends the court erred in several respects in using the modified total cost method in its award of delay damages relating to the framing and drywall phase. "The total cost method derives damages as the difference between a contractor's actual costs and its original bid." (*Servidone Const. Corp. v. U.S.* (Fed.Cir. 1991) 931 F.2d 860, 861.) In the event some of the costs of the contractor are deemed unreasonable or were the result of "its own errors or omissions, then those costs are subtracted from the damages to arrive at a modified total cost. [Citation.]" (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1408 (*Dillingham-Ray Wilson*); see Annot., "Total Cost Method (or Approach)" and "Modified Total Cost Method (or Approach)" to Proving Damages in State Contract Cases (2004) 124 A.L.R.5th 375, 389 [modified total cost approach may be utilized where most damages are attributable to defendant and "contractor can isolate and quantify those damages that arose due to causes for which the contractor is responsible"].) As explained by the California Supreme Court, to invoke the total cost method for recovering damages, a contractor must establish "(1) the impracticality of proving actual losses directly; (2) [its] bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs. [Citation.]" (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 243 (*Amelco*); see also *id.* at pp. 243-244 ["trial court bears the initial responsibility of determining that each element of the four-part test" is satisfied].)

EAR, citing *Amelco*, *supra*, 27 Cal.4th at page 243, contends the total cost method of computing damages "is generally disfavored" under the law. Although not favored, the total cost method—along with its subcategory, the modified total cost method—has been recognized in California as an appropriate way of computing damages. (See, e.g.,

---

home office overhead. But Perez testified that the advertising and entertainment expenses were insignificant and did not affect his calculation under the *Eichleay* formula.

*Guy F. Atkinson Co.*, *supra*, 187 Cal.App.3d at p. 32; *C. Norman Peterson C. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 646-647; see also California Civil Jury Instruction (CACI) No. 4541.)  Further, although our high court in *Amelco*—because the municipality did not contest the issue—declined to decide whether the total cost formula was an appropriate method of calculating damages in a breach of a public contract case (*Amelco*, at p. 242), the Second District Court of Appeal, Division Two, concluded that the *Amelco* court in fact upheld common law principles "permit[ting] a public contractor to pursue either a total cost theory or a modified total cost theory." (*Dillingham-Ray Wilson*, *supra*, 182 Cal.App.4th at p. 1408.)  The court reached this conclusion because *Amelco* cited *Guy F. Atkinson*, *supra*, 172 Cal.App.3d 25, and did not disapprove of the result in that case.  (*Dillingham-Ray Wilson*, at p. 1408.)

The California Supreme Court has emphasized that one of the major concerns in the use of the total cost method is that it not be used as " 'a substitute for proof of causation.' [Citation.]" (*Amelco*, *supra*, 27 Cal.4th at p. 244.)  Here, there was substantial evidence of a causal connection between the extra cost JMR incurred in the Project's framing and drywall phase and EAR's breach of contract.  Moreover, the cautionary statement in *Amelco* that the total cost method " 'should be applied only to the smallest affected portion of the contractual relationship that can be clearly identified' [citation]" was heeded:  JMR used the modified total cost method to calculate damages related only to the framing and drywall phase of the Project, not to damages related to the entire Project.

EAR also contends there was a lack of evidence to support a finding of the four prerequisites recited in *Amelco* (hereafter the *Amelco* elements) for use of the modified total cost method.  As we discuss below, the trial court specifically addressed each of the *Amelco* elements in its statement of decision, and substantial evidence supported the court's conclusions that JMR established each element.

34

The trial court specifically found JMR had established the first *Amelco* element—"the impracticality of proving actual losses directly." (*Amelco*, *supra*, 27 Cal.4th at p. 243.) In so concluding, the court cited the testimony of JMR's job superintendent, Steven Hupaylo, which it found credible. As the court stated, Hupaylo had testified that JMR had a good design for performing the framing and drywall work, but he (Hupaylo) "had to wait for EAR to complete its rough-in work before he could complete the walls, and, because of EAR's delays, he never had all four walls and a ceiling in any room to work with." The trial court concluded: "Consequently, the disruption occurred throughout the entire period of that work, was not confined to one particular section or time, so [it] could not be tracked specifically as the disruption occurred." Furthermore, Perez testified, based upon Hupaylo's testimony, that because "every wall was impacted by EAR's performance, [this] mean[t] that the impacts and the costs are intrinsically intertwined [and it is] difficult if not impractical or impossible to segregate [the] individual impacts."

The trial court also found JMR had established the second *Amelco* element, i.e., the reasonableness of its bid. (*Amelco*, *supra*, 27 Cal.4th at p. 243; see Gibbs & Hunt, Cal. Construction Law, *supra*, Construction Claims, § 6.14[A], p. 471 [stressing the importance of accuracy of bid estimate to contractor's claim under total cost method].) The court noted that (1) Rivard, as an expert experienced in estimating, testified concerning his methodology for preparing his bid, and opined that the bid for the framing and drywall phase was reasonable; (2) Perez reviewed the bid, noted that Rivard's methodology was consistent with other contractors and was based upon historical information, and was satisfied it was accurate; (3) Perez opined the $220,000 stated in the bid was a reasonable cost for the framing and drywall phase; and (4) EAR offered no expert testimony to rebut or contradict the reasonableness of the framing and drywall bid.

Likewise, the court concluded JMR's actual costs for the framing and drywall phase were reasonable—the third *Amelco* element. (*Amelco*, *supra*, 27 Cal.4th at p. 243.)

35

In concluding that "the actual costs were reasonable and accurately recorded," the trial court cited to the testimony of JMR's experts, Connerty and Perez. It noted that Connerty reviewed JMR's costs associated with the framing and drywall phase, and that Connerty's work was "substantial." The trial court indicated that Connerty "did not just accept JMR's numbers; he [']did a lot of testing['] of the accounts for reasonableness by actually reviewing a number of invoices, and conducted an independent analysis."

Finally, the trial court found JMR was not responsible for the added costs—the fourth *Amelco* element. (*Amelco*, *supra*, 27 Cal.4th at p. 243.) It concluded EAR was solely at fault for the disruption in the completion of the framing and drywall phase. The court cited the testimony of Hupaylo that because of EAR's delays in "not having materials, not having skilled people, and sometimes not having any people working at all, JMR's crews had to work piecemeal" and in an inefficient manner to complete the work. The court "accept[ed] the testimony of Steve Hupaylo as accurate." It also relied on Perez's testimony that, based upon his review of certified payroll records, "the number of [EAR] workers reported on the certified payroll corresponded with the low percentage of completion." Perez also testified that EAR's rough-in work took four months to complete, notwithstanding that EAR had scheduled 34 days for the work. The trial court agreed with Perez's "conclusion that . . . JMR was confronted with the incomplete work and stacking of trades, which disrupted its efficiency."

EAR points to testimony it presented to suggest that JMR's cost overruns were due to its hiring of expensive out-of-town labor and the high level of quality required for the drywall finish. But the trial court rejected these arguments. The court indicated in its statement of decision that "Pendurthi's contrary conclusory explanations [regarding the framing and drywall disruption we]re not credible," and the court found Pendurthi's "testimony weak and unreliable." Moreover—as was the case with JMR's presentation of *Eichleay* damages—EAR offered no expert testimony to contradict JMR's showing

36

that the modified total cost method was appropriate for calculating its damages associated with the framing and drywall phase.

As a variant of its contention that the court erred in concluding JMR was not responsible for the added cost, EAR argues, quoting from *Amelco* at p. 246, that damages were not recoverable under this method because JMR did not " 'distinguish between those inefficiencies that were [JMR's] and those believed to be the responsibility of the [Army] (and presumably other prime contractors and subcontractors).' "  But the court rejected EAR's contention that JMR was responsible for inefficiencies in the framing and drywall phase, and there was substantial evidence to support the court's conclusion.

Lastly, EAR contends the disruption damages awarded by the court were "admittedly inaccurately calculated" because they failed to account for a $90,000 miscoding error about which Rivard testified.  This argument relates to cross-examination in which defendants' counsel asked if Rivard had given prior deposition testimony to the effect that there was an approximate $90,000 miscoding of costs that were not related to the framing and drywall phase of the Project.  Defendants raised this issue twice in their posttrial briefing.  The trial court addressed this contention in its statement of decision. The court concluded that Rivard's deposition testimony concerning the "$90,000 coding overcharge" was essentially superseded by testimony from Perez and Connerty that, shortly before trial, Rivard advised them that the adjustment for miscoded items was approximately $48,200.[9]  The trial court thus characterized the $90,000 coding error as a "relatively unfocused pre-trial examination estimate" that did not warrant further consideration in its award of damages.  Giving deference to the court's role as trier of

---

[9] The statement of decision recites that the figure given by Rivard to Perez and Connerty shortly before trial was "a final $428,200 adjustment for items that were properly counted for tasks other than metal studs and drywall."  This is an obvious typographical error, as Connerty testified the figure was "$48,200 and something" and Perez testified the figure was $48,262.

37

fact, we conclude there was no error in disregarding the purported $90,000 coding error in determining JMR's disruption damages.

We thus conclude there was no legal impediment to JMR's use of the modified total cost method of calculating its damages associated with the framing and drywall phase of the Project. The trial court was justified in concluding that JMR had established each of the four *Amelco* elements required for utilizing this method. (*Amelco*, *supra*, 27 Cal.4th at p. 243.) The fact that the damages claimed using this formula may have only been a reasonable approximation of JMR's loss associated with this phase of the Project is not an obstacle to its use, since the fact of such damages was established by substantial evidence. (*Acree*, *supra*, 92 Cal.App.4th at p. 398.)

### C.      EAR's Challenges to the Statement of Decision

Interwoven throughout its briefs on appeal is EAR's challenge to the legal sufficiency of the trial court's statement of decision. Citing repeatedly to *Duff v. Duff* (1967) 256 Cal.App.2d 781—a case that predated by 14 years the Legislature's amendment of section 632 to provide a procedure governing statements of decision in civil trials (see Stats. 1981, ch. 900, § 1, p. 3425)—EAR claims that because of the court's alleged failure to make findings, "reversal of the Judgment . . . is compelled." We conclude the statement of decision is legally sufficient..

Section 632 provides in relevant part: "The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the [timely] request of any party appearing at the trial." The statement of decision need only " 'state ultimate rather than evidentiary facts.' " (*In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 686.) The court is not required "to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case. [Citations.]" (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 (*Bauer*).) Stated otherwise, "[a] statement of decision need not address all the legal and factual issues

38

raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. [Citations.]" (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125 (*Muzquiz*).) As this court has stated, " ' "[u]ltimate fact[]" ' is a slippery term, but in general it refers to a core fact, such as an element of a claim or defense, without which the claim or defense must fail. [Citation.] It is distinguished conceptually from 'evidentiary facts' and 'conclusions of law.' [Citation.]" (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 (*Yield Dynamics*).)

After the court issued its tentative decision on April 30, 2012, defendants submitted a request for a statement of decision and a 72-item list of purported controverted issues they wished to have addressed. At the court's direction in its tentative ruling, JMR submitted a proposed statement of decision on May 29, 2012. Following receipt of defendants' objections to JMR's proposed statement of decision, the court signed a 23-page statement of decision on July 19, 2012.

In its opening brief, EAR identifies 16 "controverted issues" the court allegedly failed to address. EAR argues the failure to address these issues requires reversal of the judgment.[10] We have reviewed each of these "controverted issues." Like the controverted issues this court considered in *Yield Dynamics*, EAR's issues are

---

[10] EAR states in its opening brief that "JMR's proposed statement of decision [ultimately adopted by the court] failed to provide written findings on not less than fifty-one (51) controverted issues raised in EAR's request." But EAR identifies and provides argument relative to only 16 of the "controverted issues" it contends the court failed to address. We need not identify or discuss the remaining 35 "controverted issues" purportedly not addressed by the court in its statement of decision. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate court has no obligation to "develop the appellants' arguments for them"]; see also *In re S.C.* (2006) 138 Cal.App.4th 396, 406 [appellate court is not required to search the record in order to discover support for the litigant's position].)

39

"compound, argumentative, tendentious, or vague, reading more like interrogatories" than "controverted issues" properly identified under section 632. (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 558.)

Contrary to EAR's assertions, some of the identified issues were specifically addressed by the trial court in its statement of decision. For instance, the trial court addressed, in several different places, the following purportedly unaddressed issue: "4) How did EAR's acts or omissions allegedly constituting a material breach of the Plumbing Subcontract cause JMR any damage?"[11] Other issues—essentially interrogatories—asked the trial court to cite legal authority in support of various aspects of its decision. Several issues were compound, argumentative and tendentious. For instance, one request (issue "58") asked the court to identify the "legal authority [under which] EAR [is] responsible for JMR's own delays to the project where the Army Corps of Engineers recognized that JMR was 5% behind schedule, that JMR's three phase inspections were 'lacking,' that JMR's superintendence was 'lacking,' that JMR was 'working without activity hazard analysis,' and where JMR had 'inadequate site supervision.' " And some of the issues invited the court to provide specific evidentiary detail unnecessary to explaining the court's decision.

As noted earlier, the trial court was only required to address " 'ultimate rather than evidentiary facts' " in its statement of decision. (*Muzquiz*, *supra*, 79 Cal.App.4th at p. 1125, quoting *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599; see also *Hellman v. La

---

[11] Other issues identified by EAR and addressed by the trial court include: (1) issue "26," concerning whether Perez's calculation of disruption damages had taken into consideration a $90,000 "miscalculat[ion]"; (2) issue "66," concerning whether JMR was responsible for any of the disruption damages it claimed; (3) issue "68," concerning whether JMR's bid contemplated JMR's using out-of-town labor, performing work out of sequence, or extra cost associated with achieving a " 'level-five drywall finish' "; and (4) issue "65," concerning whether JMR's disruption damages were capable of calculation with certainty.

40

*Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230.)  It was not required to give a point-by-point response to a party's statement of purported controverted issues. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498; *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736, fn. 15.)  The trial court's statement of decision "sufficiently dispose[d] of all the basic issues in the case" (*Bauer*, *supra*, 46 Cal.App.4th at p. 1118) and adequately "state[d] the grounds upon which the judgment rest[ed]" (*Muzquiz*, *supra*, 79 Cal.App.4th at p. 1125).

 II. *SureTec's Challenge to the Judgment Due to Lack of Default Notice*

 SureTec contends the trial court erred in finding it liable under the performance bonds because JMR failed to give it (SureTec) notice of EAR's default under the subcontracts.  SureTec argues that a "declaration of default was a condition precedent to SureTec's liability."  It also argues that, looking at the language of the bonds as a whole, there was an implied requirement that JMR provide a notice of default to SureTec as a condition precedent to SureTec's liability under the bonds.

 There was undisputed evidence, based upon Rivard's testimony, that JMR did not formally declare EAR in default under either subcontract.  Nor did JMR ask SureTec to complete the bonded work under either subcontract.  At trial, Cynthia Vincent, a SureTec vice-president, testified that SureTec received no notice of any default under the plumbing or electrical subcontracts.  She also testified that SureTec was not given the opportunity to complete work under either subcontract, and that JMR never asked SureTec to obtain new plumbing or electrical subcontractors.

 A. Contractual Conditions Generally

 A conditional obligation is one in which "the rights or duties of any party thereto depend upon the occurrence of an uncertain event."  (Civ. Code, § 1434; see also Rest.2d, Contracts, § 224:  "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.")  "[P]arties may expressly agree that a right or duty is conditional upon the occurrence or

41

nonoccurrence of an act or event." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313 (*Platt Pacific*).) A condition in a contract may be a condition precedent, concurrent, or subsequent. (Civ. Code, § 1435.) "[A] condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." (*Platt Pacific*, at p. 313; see also Civ. Code, § 1436.)

"The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract. [Citation.]" (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199.) But "stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result. [Citations.]" (*Alpha Beta Food Markets v. Retail Clerks Union Local 770* (1955) 45 Cal.2d 764, 771 (*Alpha Beta Food*); see also *Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53 [contract provisions are not construed as conditions precedent in the absence of language plainly requiring such construction]; *City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 493.) Because "such conditions are not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them. [Citation.]" (*Antonelle v. Kennedy & Shaw Lumber Co.* (1903) 140 Cal. 309, 315.)

### B.  Interpretation of the Contract Language

Resolution of SureTec's contention that a notice of default was a condition precedent to its liability requires an independent review of the trial court's interpretation of the bonds, since no extrinsic evidence was introduced by the parties on that question. (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336; see also *Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1461 [appellate court reviews interpretation of bonds de novo].)

42

"A surety bond is a ' "written instrument executed by the principal and surety in which the surety agrees to answer for the debt, default, or miscarriage of the principal." ' [Citation.]" (*American Contractors Indem. Co. v. Saladino* (2004) 115 Cal.App.4th 1262, 1268.) In the suretyship context, "the risk of loss remains with the principal, while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults. [Citation.] In the absence of default, the surety has no obligation. [Citation.]" (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 38 (*Cates Construction*).) A performance bond, a species of a surety bond, is one in which the surety "guarantee[s] that obligations undertaken by the principal will be completed under the terms of the bonded contract." (1 Baier et al., Cal. Mechanics Liens and Related Construction Remedies (Cont.Ed.Bar 4th ed. 2014) Private Works Remedies, § 2.115, p. 145.) When the principal breaches its contract with the bond's beneficiary (i.e., the owner, or, in this case, the general contractor), "generally the surety's liability has been found to be coextensive with that of its principal. If the principal is liable under the contract, the surety is liable under the performance bond. [Citation.]" (*Ibid.*) This may include, in the event of the principal's default, the surety's liability under the bond for "damages attributable to [its] principal['s] delay in performing [a] construction contract. [Citations.]" (*Cates Construction*, at p. 41.)

A surety contract is interpreted pursuant to the same rules that govern the interpretation of contracts generally. (*Pacific Employers Ins. Co. v. City of Berkeley* (1984) 158 Cal.App.3d 145, 150 (*Pacific Employers*), citing *United States Leasing Corp. v. DuPont* (1968) 69 Cal.2d 275, 284; Civ. Code, § 2837.) To determine the surety's liability, "we look first to the express terms of the performance bond. [Citations.]" (*Cates Construction, supra*, 21 Cal.4th at p. 39.) Performance bonds typically incorporate by reference the general contract or subcontract for which the bond was issued. As such, " 'the bond and the contract should be read together and construed fairly and reasonably as a whole according to the intention of the parties.' [Citations.]" (*Id.* at

43

pp. 39-40; see also *Pacific Employers*, at p. 150 [generally, "contract performance bond will be read with the contract"].)

Each subcontract here requires EAR to furnish JMR, as the named obligee, a performance bond and a payment bond "to secure the faithful performance of the Subcontract Work and to satisfy all Subcontractor payment obligations related to the Subcontract Work." On November 10, 2006, SureTec issued separate performance bonds for EAR's electrical subcontract and its plumbing subcontract, listing the penal amounts of the bonds as $732,500 and $471,881, respectively. Each performance bond specifically incorporates by reference the respective subcontract for which the bond was issued.

The one-page "Articles" of the two performance bonds contain identical language. Article 1, containing the heading "SCOPE OF BOND" (emphasis omitted), states: "The Principal [EAR] and the Surety [SureTec], jointly and severally, bind themselves . . . to the Obligee [JMR] for the performance of the Subcontract." Under the heading "EFFECT OF OBLIGATION" (emphasis omitted), Article 2 provides: "If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect." Article 4, under the heading "PRINCIPAL DEFAULT" (emphasis omitted), provides: "Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly" (1) "[c]omplete the Subcontract in accordance with its terms and conditions"; (2) retain a new subcontractor to complete the Principal's work under the subcontract; (3) pay the Obligee the amount for which the Surety is liable; or (4) deny liability in whole or in part, providing an explanation for doing so.

Each subcontract details JMR's right to deduct or withhold payments to EAR, and JMR's rights in the event of EAR's breach. Furthermore, each subcontract specifically requires JMR to provide written notice to EAR in a number of circumstances. Those

44

circumstances include where (1) JMR elects to deduct from amounts otherwise due to EAR any sums EAR owes JMR;  (2) JMR "deems it necessary and desirable to [withhold payments due to EAR to] protect itself against possible loss or damages"; (3) JMR concludes EAR has failed to (a) supply sufficient skilled workers, (b) adhere to the work schedule, (c) pay workers or suppliers, (d) follow the law, or (e) has otherwise materially breached the subcontract, requiring JMR to give EAR notice to cure the default; (4) JMR elects to suspend EAR's work under the subcontract; (5) the owner suspends its agreement with JMR; (6) JMR elects to terminate the subcontract due to EAR's material default of its obligations under the subcontract, after having given EAR written notice to cure; and (7) the owner terminates its agreement with JMR.  None of these notice provisions requires JMR to give written notice *to the surety, SureTec*.  Furthermore, each subcontract provides that the surety need not be advised of any changes, additions, or omissions to the subcontract.

## C.   Discussion

SureTec implicitly acknowledges that neither performance bond *expressly* provides that JMR must give notice to SureTec of EAR's default as a condition precedent to SureTec's liability.  But it asserts that "[a] contractual provision need not be expressly labeled 'condition precedent' to be treated as such.  Rather, whether a provision is a condition precedent is to be determined from the whole contract, its purpose, and the intention of the parties."  Quoting from *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 611 (*Wal-Noon*), SureTec contends the default notice as a condition precedent 'may be necessarily implied in the language of [the] contract . . .' "  Applying principles of contract interpretation, we conclude that JMR was not required to give SureTec notice of EAR's default as a condition precedent to SureTec's liability on the bonds.

The only notice language in the bonds is found in Article 3, where SureTec expressly "waive[d] notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee [JMR]."

45

(Italics added.) And the default provisions in the subcontracts—incorporated by reference into the bonds—include requirements in several instances that JMR give notice to EAR without any similar requirement of giving notice to SureTec. Thus, the bonds do not contain the requisite "clear, unambiguous language" (*Alpha Beta Food*, *supra*, 45 Cal.2d at p. 771) that would support a finding that JMR was required to provide a notice of default to SureTec as a condition precedent to liability under the bonds.

*Pacific Allied v. Century Steel Products* (1958) 162 Cal.App.2d 70 (*Pacific Allied*) is instructive. There, the defendant (Century) agreed to fabricate and sell steel forms to plaintiff (Pacific) for the purpose of using them to install storm drains. (*Id.* at p. 72.) Century also guaranteed that Pacific's labor costs, through its use of Century's steel forms, would not exceed four cents per square foot, and that Century would, upon completion of the job and Pacific's submission of an itemized cost breakdown, pay Pacific's labor costs in excess of four cents per square foot. (*Id.* at p. 73.) Pacific agreed to keep a detailed account of labor costs and give Century a "continuous report." (*Ibid.*) Pacific kept Century apprised of costs during the project and gave it periodic oral reports, but it did not provide a detailed cost breakdown upon the project's completion. (*Id.* at p. 78.) The court rejected Century's contention that Pacific was required to provide a detailed cost breakdown as a condition precedent to its recovery under the contract. (*Id.* at pp. 79-80.) The appellate court held that (1) conditions precedent are not favored in the law; (2) neither the express terms of the contract nor a reasonable implication drawn from them compelled a finding that providing the cost breakdown was condition precedent to Pacific's recovery; and (3) the interpretation advanced by Century was particularly disfavored because it would result in a forfeiture. (*Id.* at pp. 79-80.)

Here, as in *Pacific Allied*, there was no language expressly conditioning SureTec's performance under the bonds upon receipt of a notice of default from JMR. In *Pacific Allied*, there was an express agreement by the plaintiff to provide some level of

46

notification (a detailed cost breakdown) to the defendant. Here, there was no such express covenant requiring JMR to provide any notice to SureTec.

We conclude that SureTec's receipt of a declaration of default by JMR is not a condition precedent to triggering SureTec's liability under the bonds. This interpretation necessarily defeats SureTec's argument that a condition precedent should be implied from the language of the bonds. This interpretation is also consistent with the statutory mandate that courts, in construing an instrument, shall " 'not [] insert what has been omitted, or [] omit what has been inserted.' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954, quoting § 1858; see also *Safeco Ins. Co. of America v. Robert S.* (2001) 26 Cal.4th 758, 763 [applying § 1858 to reject insurer's contention that illegal act exclusion in homeowner's insurance policy should be construed as a "criminal act" exclusion, observing that if insurer had "wanted to exclude criminal acts from coverage, it could have easily done so"].)

Likewise, our construction comports with the law governing suretyships. "A suretyship obligation is to be deemed unconditional unless its terms import some condition precedent to the liability of the surety." (Civ. Code, § 2806; see *Bank of America v. McRae* (1947) 81 Cal.App.2d 1, 7 ["guaranty is unconditional unless its terms import some condition precedent to the liability of the guarantor"].) Here, Article 1 of each bond creates the unconditional obligation to the effect that EAR and SureTec "jointly and severally, bind themselves . . . to [JMR] for the performance of the Subcontract."

SureTec contends that, notwithstanding Article 1, its obligation here was discharged under Article 2 of the performance bonds, which reads: "If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect." SureTec asserts that because EAR performed its obligations by completing its work under the subcontracts, the bonds became "null and void" under Article 2. This contention has no merit.

47

As discussed in detail, *ante*, the trial court found, based upon substantial evidence, that EAR breached the plumbing and electrical subcontracts by, among other things, delayed performance under the contracts and by disrupting the efficient completion of the framing and drywall phase of the Project. EAR's breach gave JMR the option to terminate the subcontracts, but it was not required to do so. (See *Whitney Inv. Co. v. Westview Development Co.* (1969) 273 Cal.App.2d 594, 602.) That JMR did not terminate the subcontracts as a result of EAR's breach does not absolve EAR of responsibility for breaching the contracts. "[Breach of contract d]amages for delay can result from either a total or partial failure of performance. In both cases, delay damages are an extra item of recovery in addition to the normal measure of damages. However, even when there has been complete performance of a contract, damages for delay can result when performance was not completed on time." (Cal. Attorney's Guide to Damages, *supra*, § 1.49, pp. 1-49 to 1-50.)

Furthermore, under general suretyship law, Civil Code section 2807 provides that "[a] surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, *and without demand or notice*." (Italics added; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2015) ¶ 6:3436, pp. 6I-72 to 6I-73 ["if the bond is silent, the obligee is not required to give the surety notice of the principal's default or make demand upon the surety for payment"].)

Thus, for instance, in *State Bd. of Equalization v. Balboa Ins. Co.* (1978) 89 Cal.App.3d 499, the surety was held liable on sales tax surety bonds after the principal's default, notwithstanding the obligee's (State Board of Equalization's) failure to make demand for payment or its failure to include the surety on a notice of lien. (*Id.* at pp. 503-504.) The court explained that when the surety executed the surety bonds, "it did not put conditions of special or separate notice" upon its "agreement to stand good for [the principal's] tax liability." (*Id.* at p. 504.) Citing Civil Code section 2807, the court

48

held the surety was liable under the bonds because neither the law nor the agreement required notice as a condition to the surety's liability. (*Ibid.*)

SureTec relies on several out-of-state cases to support its contention that a declaration of EAR's default by JMR to SureTec was a condition precedent to JMR's recovery under the bonds. Several of these cases were based upon the courts' interpretation of the relevant contracts under applicable Florida law. (See, e.g., *L&A Contracting v. Southern Concrete Services* (5th Cir. 1994) 17 F.3d 106 (*L&A Contracting*); *School Bd. of Escambia County v. TIG Premier Ins. Co.* N.D.Fla. 2000) 110 F.Supp.2d 1351; *DCC Constructors, Inc. v. Randall Mechanical, Inc.* (Fla.Ct.App. 2001) 791 So.2d 575.) In *L&A Contracting*—a case relied upon by a number of the authorities cited by SureTec—the Fifth Circuit Court of Appeals concluded that a contractor's unequivocal declaration of the subcontractor's default was "a necessary precondition" to the surety's liability under a performance bond. (*L&A Contracting*, at p. 111; cf *Colorado Structures Inc. v. Ins. Co. of the West* (Wash. 2007) 167 P.3d 1125, 1134 [disagreeing with *L&A Contracting*, concluding that a proper interpretation of the bond's language in that case is that it created "liability, subject to a single express condition subsequent (the principal's prompt and faithful performance)"]; *Walter Concrete Const. Corp. v. Lederle Labs.* (N.Y. 2003) 788 N.E.2d 609, 610 [rejecting surety's claim that default notice was required, holding that had parties wished to make liability conditioned on default notice, they could have expressly so provided in performance bond].) But *L&A Contracting*, and other cases relied on by SureTec, did not involve a contractual interpretation of performance bonds under California law. And none of those authorities considered the appropriateness of implying a condition precedent relating to default notice in light of decisional authority prohibiting such a construction unless the contractual language plainly requires it. (See *Rubin v. Fuch*, *supra*, 1 Cal.3d at p. 53; *Alpha Beta Food*, *supra*, 45 Cal.2d at p. 771.) Indeed, *L&A Contracting* does not discuss conditions precedent generally or the appropriateness of

49

implying a condition not expressly stated in a contract. We therefore decline to follow the out-of-state authorities relied upon by SureTec. (See *People v. Uribe* (2011) 199 Cal.App.4th 836, 865, fn. 15 [California courts not bound by out-of-state decisional authority].)

We read the performance bonds together with the subcontracts to which they relate in ascertaining the intentions of the parties. (*Cates Construction*, *supra*, 21 Cal.4th at pp. 39-40.) A number of provisions in the EAR subcontracts require JMR to give notice to EAR; none of these provisions requires notice to SureTec. The performance bonds themselves contain no express requirement of any notice to the surety. The only mention of notice in either bond is a provision under which SureTec waives notice of any alteration or extension of the referenced subcontract. Reading Article 1 together with Article 2 of each bond—in conjunction with the language of the subcontracts incorporated by reference—yields the conclusion that SureTec's obligation to JMR in the event of EAR's breach of the underlying subcontract is unconditional. (See *id.* at p. 41 [considering the documents "as a whole, the bond and underlying construction contract are fairly and reasonably read as requiring" surety to answer for principal's failure to perform under contract].)

We conclude the performance bonds did not require JMR to give notice of default to SureTec as a condition precedent to recovery under the bonds. Any interpretation of the bonds as implying such a condition precedent would be contrary to (1) suretyship principles (see Civ. Code, §§ 2806, 2807), and (2) the principle that conditions precedent should not be implied unless the construction is compelled by the clear language of the agreement, particularly here, where such an implied condition would result in a forfeiture. (*Alpha Beta Food*, *supra*, 45 Cal.2d at p. 771.)[12]

---

[12] SureTec also cites *Wal-Noon*, *supra*, 45 Cal.App.3d 605 in support of its position that notice of default to SureTec was an implied condition precedent to recovery under the performance bonds. But *Wal-Noon* involved a landlord-tenant dispute in

### III. The Attorney Fee Order

Defendants separately challenge the postjudgment order awarding JMR attorney fees in defending EAR's cross-complaint. EAR asserts that the underlying premise of the court's decision—that JMR prevailed on the cross-complaint—is faulty. It argues that it "clearly and unambiguously prevailed" on the two causes of action for breach of contract alleged in its cross-complaint. SureTec contends the award of attorney fees against it was legally improper because the scope of its liability under the performance bonds did not extend to attorney fees incurred by JMR to defend the unmeritorious cross-complaint filed by SureTec's principal, EAR. We must consider initially whether defendants' claims are cognizable on appeal. (See *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126 [appellate court required to address sua sponte the question of appealability "whenever a doubt exists" concerning the issue].)

After entry of judgment, JMR filed a motion for attorney fees awardable as costs pursuant to Civil Code section 1717 (attorney fee motion). On November 9, 2012, the court heard argument concerning various motions, including JMR's attorney fee motion.

---

connection with the lease of a commercial building. The lessees, without the lessors' knowledge, replaced the premises' leaky roof, and later sought reimbursement from the lessors because the lease had imposed upon the lessors the obligation to repair and replace the roof and all exterior walls. (*Id.* at pp. 608-610.) The appellate court concluded that "notice as a condition precedent to the lessors' obligation to repair is not only clearly apparent from the terms of the written lease, it is indispensable to effectuate the intentions of the parties. [Citation.] It has been held that unless explicitly excluded therein, performance under an express covenant to repair is conditional upon notice from the tenant. [Citations.] Accordingly, we hold that notice is an indispensable condition precedent to [the lessors'] duty to perform under the covenant to repair" (*Id.* at p. 612.) Here, we address surety bonds and a surety-obligee relationship, not a commercial lease and a landlord-tenant relationship. Thus, the facts of *Wal-Noon* are distinguishable. This case, unlike *Wal-Noon*, requires application of suretyship principles (e.g., Civil Code sections 2806 and 2807). Those principles, along with the absence of a clear indication that the parties intended otherwise, compel our conclusion that notice of default to SureTec was not an implied condition precedent to recovery under the bonds.

51

The court's tentative decision regarding that motion, in which it cited *Johnson v. Siegel* (2000) 84 Cal.App.4th 1087, was twofold: (1) JMR, because it did not seek mediation of its claims before filing suit, was not entitled to attorney fees for pursuing its complaint; but (2) JMR was entitled to attorney fees for its defense of EAR's cross-complaint.

In its written order of November 13, 2012, the court, among other things, ordered JMR to calculate the amount of attorney fees incurred before the filing of EAR's cross-complaint. The court also set a deadline for that submission and for a response by defendants. The court further indicated in its order that it would "issue an award of Attorney Fees to JMR, consistent with its tentative ruling on November 2, 2012."[13] The record does not include an order fixing an *amount* of fees entered subsequent to the court's November 13, 2012 order. EAR has indicated in its opening brief that it expressly reserves the right to appeal any such order fixing the amount of attorney fees. And the parties at oral argument on November 19, 2015, indicated that, as of that date, the court had not yet issued an order fixing the amount of attorney fees awardable to JMR.

A postjudgment award of attorney fees is generally appealable pursuant to section 904.1, subdivision (a)(1). (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 706.) But "if a judgment determines that a party is entitled to attorney's fees but does not determine the amount, that portion of the judgment is nonfinal and nonappealable." (*P R Burke Corp. v. Victor Valley Wastewater Reclamation Authority* (2002) 98 Cal.App.4th 1047, 1053 (*P R Burke*).) This conclusion is based upon the principle that an order that contemplates further action by the court is not final. (See *Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545; *Steen v. Fremont Cemetery Corp.* (1992) 9 Cal.App.4th 1221, 1228-1229.)

_____

[13] The record does not contain a tentative ruling dated November 2, 2012. We assume the trial court was referring to its tentative ruling made at the hearing on November 9, 2012.

52

Here, the November 13, 2012 postjudgment order was nonfinal because it did not fix an amount of attorney fees awardable to JMR.  Rather, it simply adopted the court's tentative ruling denying attorney fees to JMR for its prosecution of the complaint and granting fees for its defense of the cross-complaint.  The court specifically contemplated a future order awarding JMR a fixed amount of attorney fees after the parties submitted further pleadings.  Thus, the order "was nonfinal [because f]urther judicial action was necessary to determine the *extent* of [JMR's] entitlement to attorney's fees."  (*P R Burke*, *supra*, 98 Cal.App.4th at p. 1054, italics original.)  It was a " 'postjudgment' order[] [that] lacked finality in that [it was] also preparatory to later proceedings," a type of order which the California Supreme Court has held is generally not appealable.  (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 653.)  But this conclusion does not end our inquiry.

SureTec argues somewhat conclusorily that "the trial court's order that JMR is entitled to attorney[] fees is the necessary predicate for its final [] appealable order, also entered [] November 13, 2012, that JMR is entitled to $90,644.07 in expert witness fees." While we agree with SureTec's implicit statement that the court utilized its attorney fee order in concluding that JMR was entitled to expert witness fees, we disagree with SureTec's ultimate conclusion that we are required to review the court's interim nonfinal attorney fee order here.

Under section 906, where an appeal under section 904.1 is taken, "the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party."  (See *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 649.)  The intermediate order of November 13, 2012, finding defendants liable to JMR for attorney fees is related to the court's order of the same date awarding JMR's expert witness fees under section 998.  As we discuss in section IV, *post*, the court's award of expert fees to JMR pursuant to

53

section 998 was founded on the assumption that, after aggregating JMR's monetary recovery under the judgment with its attorney fee award, JMR will recover more than its pretrial $375,000 offer to compromise. But, as we also discuss, since the court has not yet issued a monetary award of fees, its determination that JMR's total recovery has exceeded $375,000 is erroneous. Thus, the court's November 13, 2012 interim order determining that JMR is entitled to recover attorney fees in defending EAR's cross-complaint is not relevant to our consideration of the appealable order awarding expert witness fees. We therefore decline to consider the nonappealable interim attorney fee order at this time.

IV.     *Award of Expert Fees Pursuant to Section 998*

After entry of judgment, JMR submitted a memorandum of costs in which it claimed, among other costs, expert witness fees in the total amount of $90,644.07. Concurrently with its costs memorandum, JMR filed a brief in which it argued it was entitled to recover expert witness fees pursuant to section 998. It asserted that more than 10 days before trial, in accordance with section 998, it had served identical offers to EAR and SureTec in which it offered to have judgment taken against the respective defendants in the amount of $375,000 with each side to bear its own costs. JMR argued that because it had obtained a judgment that—after adding statutory prevailing-party costs and attorney fees to the monetary award of $315,631—exceeded the $375,000 amount of the offers, the court in its discretion could award it reasonable postoffer expert witness costs. SureTec and EAR filed separate motions to strike/tax costs that included opposition to an award to JMR of its expert witness fees.[14]

---

[14] The motion to tax or strike costs filed by EAR is not included in the appellate record, but it is referenced in numerous documents included in the record. And EAR's reply memorandum in support of its motion to tax or strike costs, which includes argument in opposition to JMR's request for expert witness fees, is part of the record.

54

On November 9, 2012, the court heard argument on defendants' motions to strike/tax costs. The court then issued an order on November 13, 2012, denying defendants' parallel motions, thereby awarding JMR expert witness fees of $90,644.07. An order fixing costs and disposing of a motion to tax costs is a separately appealable order under section 904.1, subdivision (b). (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 996.)

On appeal, EAR and SureTec make identical arguments that the court erred in awarding JMR postoffer expert witness costs. They contend the award was improper because JMR received a judgment of $315,631, nearly $60,000 less than its section 998 offers. Further, they assert that JMR may only reach the threshold amount of more than $375,000 if it is awarded attorney fees exceeding $59,369; defendants both contend that no attorney fees should be awarded to JMR. Lastly, defendants posit that an award of expert fees is premature because the court has yet to determine a fixed amount of attorney fees awardable to JMR for purposes of determining whether it has obtained a judgment more favorable than the offers pursuant to section 998. We agree with defendants' third argument and will reverse on that basis.

Section 998, subdivision (a) provides that "costs allowed under section 1031 and 1032 shall be withheld or augmented as provided in this section." The statute sets forth a procedure by which a party, not less than 10 days before trial (or arbitration), may serve a written offer to settle the litigation, including a specification of "the terms and conditions of the judgment or award." (§ 998, subd. (b).) Under subdivision (d), "[i]f an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment . . . the court . . . in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial . . . or during trial . . . of the case by the plaintiff, in addition to plaintiff's costs." Under a parallel provision, a defendant who makes a pretrial offer that

55

is not accepted, upon the plaintiff's failure to obtain a more favorable judgment, may recover, in the court's discretion, reasonable expert costs incurred by the defendant in preparation for trial and trial.  (§ 998, subd. (c)(1).)  The statute's purpose "is to encourage the settlement of lawsuits prior to trial."  (*T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 280.)

In determining under section (d) if a defendant has failed to obtain a judgment more favorable than a plaintiff's section 998 offer, where the offer contains a waiver of costs, " 'the amount of the judgment is deemed to be the amount of the damages plus the amount of costs allowed under section 1033.5, subdivision (a).'  [Citation.]"  (*Wilson v. Wal-Mart Stores, Inc.* (1999) 72 Cal.App.4th 382, 392.)  Included among the costs permitted under section 1033.5, subdivision (a) are attorney fees that are authorized by contract.  (§ 1033.5, subd. (a)(10)(A).)

In this case, there has, to date, been no award of a defined amount of attorney fees in favor of JMR.  Pursuant to the court's November 13, 2012 order, it granted EAR's motion to strike certain costs listed in JMR's costs memorandum.  As a result, the total amount of costs awarded pursuant to JMR's costs memorandum (excluding expert witness fees) was $4,800.18.  Adding these costs to the judgment, the total judgment to date is $320,431.18, nearly $55,000 less than the pretrial offers.  It is apparent that the court—given the sizable amount of attorney fees claimed by JMR in its motion for fees under Civil Code section 1717 ($252,889)—assumed JMR would ultimately receive an attorney fee award that would bring JMR's total recovery above the pretrial offer threshold of $375,000.  But, as we have discussed (see section III, *ante*), the November 13, 2012 order regarding attorney fees is an interim, nonappealable order that contemplates further action (i.e., determining the amount of the award) by the court.  Accordingly, any finding that JMR is entitled, in the court's discretion, to an award of expert fees pursuant to section 998, subdivision (d) is premature.  We will therefore reverse the court's order of November 13, 2012, awarding JMR expert fees pursuant to

56

section 998 and will remand the case to the trial court. Such reversal is without prejudice to the court, upon rendering an attorney fee award, to make a discretionary determination as to whether JMR is entitled to an award of postoffer expert witness fees under section 998.

V.    *EAR's Motion for New Trial*

As its final claim of error, EAR contends the court abused its discretion in denying its motion for new trial. It argues the court's alleged failure to read JMR's proposed statement of decision before signing it constituted "an 'irregularity in the proceedings' " that compelled the granting of the new trial motion. This contention is without merit.

After entry of judgment, EAR filed a motion for new trial, asserting six of the seven statutory grounds provided under section 657, including "irregularity in the proceedings of the court" as provided in subdivision (1) of the statute. The bulk of EAR's argument below was that (1) JMR concealed and suppressed evidence, thereby denying EAR a fair trial, and (2) there was insufficient evidence supporting the finding of EAR's responsibility for delay and for the award of damages (including *Eichleay* damages and damages related to supplying the air compressor). Although EAR made reference to the statement of decision in its motion—challenging both its timeliness and its contents—it did not include as a basis for granting new trial the allegation that the statement of decision had been signed by the court without reading it. By failing to raise the issue below in its motion for new trial, EAR forfeited its appellate challenge to the denial of the motion on this basis. (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28 [failure to preserve issue below result in forfeiture of appellate claim].)

Moreover, even if we were to address EAR's argument on the merits, it would fail. EAR twice states in its opening brief that the trial court "failed to read" the proposed statement of decision before signing it. It presents no evidence in support of this bald assertion. (See § 658 [new trial motion based upon irregularity of the proceedings "must

57

be made upon affidavits"]; *Linhart v. Nelson* (1976) 18 Cal.3d 641, 644 [court may not consider ground for new trial motion where affidavit supporting that ground is required under section 658 and none is submitted].)  There is thus no basis for EAR's contention that the court abused its discretion in denying the motion for new trial.  (See *Plancarte v. Guardsmark, LLC* (2004) 118 Cal.App.4th 640, 645 ["trial court's broad discretion in ruling on a motion for new trial is accorded great deference on appeal"].)

VI.    *Remaining Arguments by SureTec*

SureTec asserts three further arguments.  Its first two arguments are that (1) if the judgment is reversed as to SureTec, it is entitled to its attorney fees for its successful defense of the lawsuit, including the attorney fees incurred on appeal; and (2) if the judgment against EAR is reversed, the judgment against SureTec must likewise be reversed.  Since we affirm the judgment, neither of these arguments has merit.

As its third remaining argument, SureTec argues that, assuming the judgment is not reversed, its maximum liability for damages, including costs and attorney fees, is $471,881, the amount of the performance bond issued on EAR's plumbing subcontract. It contends that because the court, despite SureTec's request, did not allocate the damage award as between the two subcontracts, there can be no inference drawn that some amount of the $315,631 damages was awarded for EAR's breach of the electrical subcontract.  Accordingly, SureTec argues, its responsibility to answer for its principal, EAR, is limited to the $471,881 amount of the performance bond for the plumbing subcontract.  It seeks an order from this court to this effect.

As discussed in section IV, *ante*, the total amount of JMR's recovery to date, including costs properly awarded by the court, is $320,431.18.  This is approximately $150,000 less than the amount of the performance bond for the plumbing subcontract. The trial court has not yet made a final ruling regarding attorney fees, and any issue concerning JMR's claimed entitlement to expert fees under section 998 will be decided by the trial court in its discretion upon remand.  Thus, at this point there is no justiciable

58

issue for resolution by this court, and we decline to decide hypothetical or theoretical controversies. (See *In re Joshua S.* (2007) 41 Cal.4th 261, 273 [courts do not " 'issu[e] purely advisory opinions, or consider[] a hypothetical state of facts in order to give general guidance rather than to resolve a specific legal dispute' "]; see also *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 998.)

## DISPOSITION

The judgment is affirmed. The postjudgment order of November 13, 2012, awarding expert witness fees to JMR pursuant to Code of Civil Procedure section 998 is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion. Statutory costs are awarded to respondent JMR.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.

59

| | |
|---|---|
| Trial Court: | Monterey County Superior Court Superior Court No.: M105497 |
| | |
| Trial Judge: | The Honorable Lydia M. Villarreal |
| | |
| Attorneys for Plaintiff, Cross-Defendant, and Respondent JMR Construction Corp.: | Joseph P. Mascovick Miller Law Group |
| | |
| Attorneys for Defendant, Cross-Complainant and Appellant Environmental Assessment And Remediation Management, Inc.: | J. Brian Urtnowski Lisamarie McDermott Urtnowski & Associates, P.C. |
| | |
| Attorneys for Defendant, and Appellant SureTec Insurance Company: | Peter Abrahams Mitchell C. Tilner Horvitz & Levy |